# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

CARLOS CORNWELL,                    )
                                    )
            Petitioner,             )
                                    )
v.                                  )          No.: 3:19-CV-00126-DCLC-DCP
                                    )
MIKE PARRIS,                        )
                                    )
            Respondent.             )
                                    )

## MEMORANDUM OPINION

Now before the Court is Petitioner's petition for a writ of habeas corpus under 28 U.S.C.

§2254, challenging the constitutionality of his confinement pursuant to a Knox County second-

degree murder conviction [Doc.1]. After reviewing the parties' filings and the relevant state court

record, the Court has determined that Petitioner is not entitled to relief under §2254, and no

evidentiary hearing is warranted. *See* Rules Governing § 2254 Cases, Rule 8(a) and *Schriro v.

Landrigan*, 550 U.S. 465, 474 (2007). For the reasons set forth below, the §2254 petition will be

**DENIED**, and this matter will be **DISMISSED**.

## I.      PROCEDURAL HISTORY AND BACKGROUND

Petitioner was indicted for one count of the first-degree premeditated murder of his wife,

Leoned Cornwell, after he ran over her with his vehicle. At trial, while both parties agreed that

Petitioner hit the victim with his vehicle, the primary issue presented to the jury was whether the

incident was accidental or intentional. The State's theory, supported by the officers who responded

to the scene and the forensic pathologist who performed the victim's autopsy, was that Petitioner

intentionally hit the victim with the front of his car, ran over her, and dragged the victim's body

for a short distance. Petitioner and the defense team argued that Petitioner had accidentally backed

over the victim and only drove forward to remove his vehicle from the victim's body. The Tennessee Court of Criminal Appeals ("TCCA") summarized the evidence adduced against Petitioner at trial as follows:

> Stephanie Anderson testified that she was a neighbor of the Cornwells at Morningside Hills Apartments. She lived next door to appellant and the victim with her husband and daughter. The Andersons' apartment shared a common wall with the Cornwells' apartment. On March 5, 2008, Ms. Anderson was awakened at approximately 4:30 a.m. by the Cornwells' arguing. Appellant was screaming at the victim, calling her profane names such as, "B* * *h. You stupid b* * *h. You stupid MF." Ms. Anderson believed that appellant sounded angry. Later that day, Ms. Anderson heard something about a death that prompted her to call Detective Steve Still. He interviewed Ms. Anderson at her home the following day. Another investigator accompanied Detective Still and simultaneously interviewed Mr. Anderson in a different room.

> Anthony Anderson, Stephanie Anderson's husband, confirmed that he heard appellant yelling at the victim, including a great deal of profanity and cursing. He also heard appellant threaten the victim by saying, "Stupid, mother f* * * *er, you know that I'll kill you."

> Cebra Griffin, Sr., testified that he worked with appellant at Smokey's restaurant at the University of Tennessee. Mr. Griffin was at work around 5:00 a.m. on March 5, 2008, and saw appellant arrive at approximately 5:25 a.m. Appellant was looking for their supervisor. Mr. Griffin believed that appellant left around 5:30 or 5:45 a.m. According to Mr. Griffin, appellant did not appear to be upset when he left.

> Angelel Williams testified that she worked at Smokey's with appellant and Mr. Griffin. She was at work on March 5, 2008. Appellant was already there when she arrived at 5:30 or 5:45 that morning. He was in a good mood and did not indicate that he and the victim had argued. Ms. Williams received a call for appellant. She did not see him leave Smokey's.

> Sandra Moore testified that she also lived in Morningside Hills Apartments. Ms. Moore's apartment shared a common wall with the Cornwells' apartment. On March 5, 2008, she awoke at 5:30 a.m. and did not hear any yelling or screaming as she was getting dressed for work. Ms. Moore left her apartment around 6:00 a.m., when she passed appellant and the victim. They were walking toward their car. She heard them bickering but did not describe it as yelling.

> Titonia Sawyer testified that she made a transaction using the ATM at ORNL Federal Credit Union at 6:22 a.m. on March 5, 2008. She approached the credit union from a back street, the name of which she did not recall. From the direction Ms. Sawyer approached, she was facing the teller lanes. Ms. Sawyer noticed a car

just in front of the teller lanes. She drove around the credit union to the ATM. The car she previously noticed pulled around, also. The driver of the vehicle approached in such a way as to leave a space between Ms. Sawyer's car and the other vehicle. Ms. Sawyer's window was rolled down and the driver's side door was ajar, allowing better access to the ATM. Ms. Sawyer did not hear arguments or music coming from the other car. From her vantage point, Ms. Sawyer could see that a male was in the driver's seat. She could not clearly see anything else until a woman exited the front passenger side of the vehicle. After the passenger exited the vehicle, the passenger looked down into the car. The female passenger did not appear agitated; Ms. Sawyer thought the woman was simply looking for her purse. The next time Ms. Sawyer looked back, the woman had both passenger side doors open. Ms. Sawyer became very nervous, thinking that she was about to be ambushed. When Ms. Sawyer received her ATM receipt, she left the credit union by the same route she arrived. The other vehicle was in the same location, but she could no longer see the woman.

Ms. Sawyer then went to work. While at her desk, Ms. Sawyer watched the local news on her computer. A news story reported that a hit-and-run had occurred at the ORNL Credit Union at approximately 6:23 or 6:24 a.m. Ms. Sawyer checked her ATM receipt, and upon confirming that her transaction occurred at 6:22 a.m., she called the police. When she spoke with the investigator, he informed her that the police were looking for her. Ms. Sawyer viewed a photograph of where the vehicle was oriented after the incident. She stated that the other vehicle was farther "down," meaning toward the street, than where she last saw it.

Gail Cox testified that she, along with her husband, Devery Cox, and their two children were in their vehicle traveling west on Magnolia Avenue on the morning in question. They stopped at a traffic light and saw a man in the eastbound lane of the road walking toward the credit union. The man was waving his arms over his head and was screaming hysterically for someone to call 9–1–1. They traveled through a green traffic signal when they noticed the man was then in the median and was signaling them to stop or slow down. Mr. Cox pulled to the median, at which time the man shouted for them to call 9–1–1 because "someone had been hit." Mr. Cox moved their vehicle from the roadway into the parking lot of ORNL Credit Union and dialed 9–1–1. As soon as the Coxes entered the parking lot, Mr. Cox saw the victim on the ground behind a maroon car. Mr. Cox saw shoes, an umbrella, and a few other items. Shortly thereafter, Mrs. Cox moved their car to another area of the parking lot to clear the way for emergency vehicles.

Mr. Cox spoke with the 9–1–1 operator at first, but because Mr. Cox was frantic and yelling, Mrs. Cox took the telephone and began to inform the operator about the incident. The victim's face was full of blood. One of her arms was contorted in such a way that it appeared it may not have been attached to the victim's body. The victim was breathing but not consistently. She would, at times, try to catch her breath. The victim's eyes were open.

Appellant was frantically running about, saying that he could not believe this was happening and that he hoped the victim was okay. Appellant informed Mrs. Cox that he and the victim were arguing when the victim exited the vehicle. Mrs. Cox gave a statement to Detective Still later that morning. She stated that appellant told her that the victim started walking immediately after exiting the vehicle, so he shifted the car into reverse and began backing up without realizing that he ran over the victim. When appellant exited the vehicle, he observed that the car was on top of the victim. Knowing that he had to move the car, he got back into the vehicle in order to move it off of the victim's body.

Mrs. Cox testified that she advised appellant to collect the victim's purse and debit card, which were on the ground, and move the items out of the way for emergency personnel. Mrs. Cox noted that one of the victim's shoes was in close proximity to her body, while the other shoe was farther down the driveway of ORNL Credit Union. She recalled that someone put the victim's shoes in the trunk of appellant's car.

Mr. Cox testified that he was more concerned about the victim than the appellant. The victim's eyes were open and she was gasping for breath. Mr. Cox was anxious for 9–1–1 to arrive and save the victim's life. Mr. Cox was worried that the victim might go into shock, so he gathered jackets from appellant, Mrs. Cox, and their son to cover the victim. As Mr. Cox was on his knees beside the victim, appellant was running around, hysterical, saying, "Oh my God, oh my God," "I need help," "What have I done?" and "What am I going to do?" Mr. Cox told appellant to calm down. At some point, Mr. Cox asked appellant to come over to where the victim was lying and call her name to see if she would respond. The victim died before emergency personnel arrived on the scene.

Stacy Foster testified that she was employed as the vice-president supervising the security and fraud department at ORNL Federal Credit Union. Ms. Foster confirmed that the victim had an account with the credit union. She provided video footage from the surveillance cameras fixed on the ATM at the credit union at the time of the victim's death. From the angle of the camera at the ATM, one could see approaching headlights. The camera recorded a customer making an ATM transaction at 6:21 a.m. on March 5, 2008. Ms. Foster identified a second set of headlights in the video footage beginning at 6:22 a.m. However, neither appellant's vehicle nor the victim were visible in the footage.

Steve Still, an investigator with the Knoxville Police Department's violent crimes unit, previously served as a fatal accident investigator. Detective Still completed training to investigate traffic fatalities but was not an accident reconstructionist. He testified that accident reconstruction involves formulas and more technical issues, while fatal accident investigators make determinations based on the evidence at the scene, witness interviews, and toxicology reports.

4

On his way to work on March 5, 2008, Detective Still responded to an incident on Magnolia Avenue. The police department's reconstructionists worked the fatalities but often called investigators to assist in interviewing witnesses. Detective Still's duty at the scene was to interview the witnesses. At some point, the status of the incident changed from being a traffic accident to "possibly something more." When he arrived on the scene, Detective Still spoke with officers to obtain a basic understanding of what had happened. As he walked around the scene and the vehicle, someone pointed out that blood appeared to be under the front of the car. The spot of blood was located on a guard or cross-piece some distance farther back from the front of the car. Detective Still would have expected to see damage to a vehicle that struck a pedestrian but observed no damage to the hood or the trunk of appellant's car. He did, however, observe drops of blood, pieces of clothing, and a brownish mark that appeared to be skin near the sidewalk of the parking lot. Detective Still asked Mr. Cox to meet him at the police department to give a statement and asked officers to transport appellant to the department.

After informing appellant of his *Miranda* rights, Detective Still interviewed appellant. Detective Still videotaped and tape-recorded the interview. In appellant's statement to Detective Still, appellant said he thought he and the victim might be splitting up. Appellant and the victim had an issue regarding car payments. Appellant went to work on the morning of the incident but left so he and the victim could make the car payment. They went to the ATM together, where they were behind another vehicle. According to appellant, the victim cursed him, exited their vehicle, retrieved her umbrella from the back of the car, and began walking toward Magnolia. Appellant backed up the vehicle to see where the victim was going, then accidentally ran over her. When appellant realized he struck the victim with the car, he pulled forward to get the car off her. Appellant stated that he did not mean to hit her and that it was not intentional. Detective Still pointed out to appellant that before he moved the vehicle, he should have checked underneath to see exactly where the victim was in relation to the tires. If the victim was between the two axles of the car, her body may have been in contact with the undercarriage but not necessarily being crushed by it. In that case, moving the vehicle off her would have injured her further.

Detective Still did not believe that appellant's version of the incident matched the evidence at the scene. Everything that Detective Still witnessed at the scene indicated that the victim's body was dragged in the opposite direction of what appellant told him. The blood under the front of the vehicle, between the front axle and the very front of the car, indicated that if appellant had indeed backed over the victim as he stated, he would have run over her with both axles of the vehicle. Based on the level of jarring that appellant would have experienced in the car, running over the victim with both axles of the car would have indicated very aggressive driving. Appellant could offer no explanation for the blood on the bottom front of the car. Detective Still was troubled by the absence of directional marks supporting appellant's version of the incident. Detective Still contacted the Knoxville Police Department reconstructionists, Ron Trentham and L.B. Steele.

Detective Still charged appellant with first degree murder. He continued investigating the case and developing information with the accident reconstructionists. In conducting his investigation, Detective Still gathered information from the following sources: Anthony and Stephanie Anderson; the medical examiner, Dr. Darinka Mileusnic–Polchan; Titonia Sawyer; credit union personnel; a co-worker of appellant; and photographs and evidence from the credit union scene. Detective Still agreed with the experts' opinion, based on the evidence and condition of the vehicle, that the victim's center of gravity was below the hood or trunk line of the car. His conclusion indicated that the victim was already on the ground when appellant ran over her.

Officer Beth Goodman was an evidence technician with the forensic unit of the Knoxville Police Department. Her duties involved gathering evidence, documenting crime scenes, and taking photographs. Officer Goodman collected the victim's clothing and personal items from the forensic center where the victim's body was autopsied. The articles of clothing included a black "hoodie," a pair of pants, underwear, a white t-shirt, a denim jacket, socks, and a sports bra. Officer Goodman also collected the victim's jewelry and keys.

Officer Dan Crenshaw, a senior evidence technician at the Knoxville Police Department, responded to the scene at ORNL Credit Union. Officer Crenshaw believed that he was responding to an accident with an injury. When he arrived, he observed a vehicle with a body partially protruding from the rear of the car. The first thing Officer Crenshaw did was take photographs. He placed cones, markers, and numbered placards beside the evidence. He also photographed the inside of the vehicle. Officer Crenshaw saw blood spatter on the ground and blood on the undercarriage of the car around the radiator. He did not notice any damage to the hood, trunk or bumpers of the vehicle. Officer Crenshaw took several other photographs before Officer Joe Cox arrived at the scene to relieve him.

Lachrisa Clemmons was the victim's daughter. On the day of the incident, Ms. Clemmons expected her mother to take her to the orthodontist around noon. Ms. Clemmons tried repeatedly to reach the victim by telephone. She called the victim's employer, Food City, to find out if the victim had gone to work. She learned from an employee that her mother was not at Food City that day. When Ms. Clemmons was finished at work, she went home, changed clothes, and took the trolley to the orthodontist. She persisted in trying to reach her mother. At 5:00 p.m., Ms. Clemmons arrived back at her home. A few minutes later, Detective Still knocked on her door and informed her that her mother had been killed earlier that day. According to Ms. Clemmons, the victim left appellant in January 2008 and stayed at the Hamilton Inn for about a week. Some time during that week, appellant stayed with the victim in the hotel while visitors from North Carolina stayed at their apartment. The victim later returned to live with appellant. Ms. Clemmons had previously seen her mother with a black eye in November 2006.

Officer Joe Cox of the Knoxville Police Department was working crime scene detail in 2008. His duties included taking photographs, collecting samples, collecting evidence, and analyzing evidence or sending the evidence away to be analyzed. When he arrived at the scene at ORNL Credit Union, he saw a maroon Infiniti in the parking lot and a deceased woman on the ground. He photographed the scene and collected blood samples. In addition to collecting blood spatter evidence, Officer Cox collected a cigarette lighter and a clump of hair from the scene. He later collected appellant's white t-shirt and pants. Officer Cox collected a pair of tennis shoes from the scene. The insole of one of the shoes had been dislodged, and the shoelace had been torn off. At the scene, Officer Cox noticed that the trunk of the vehicle was open. He ordered removal of the vehicle by a wrecker that pulled the vehicle onto the bed of the wrecker. The wrecker transported the vehicle to the police department's safety shop where it would be covered and placed on a lift so that investigators could examine the bottom of the car.

When officers examined the bottom of the vehicle, Officer Cox saw evidence that something had cleaned off parts of the underside of the car. He also observed stains that appeared to be blood on the underside of the car, as well as some other material. He swabbed the blood stains and forwarded them to the Tennessee Bureau of Investigation. The blood and "brush off" were located on the front passenger side of the automobile. Officer Cox swabbed blood stains from the front guard of the car, the rocker panel underneath the passenger-side door, the tubing guard, and the sway bar guard. He also obtained a blood swab from a back tire.

After extensive *voir dire* by appellant's counsel, during which Officer Cox offered information about his training, education, and experience, the trial court allowed Officer Cox to testify as an expert in blood spatter analysis. Officer Cox testified that he collected a blood sample from the gutter along Magnolia Avenue and from the sidewalk between Magnolia Avenue and the credit union. Officer Cox explained that when blood goes straight down at a ninety degree angle, the blood leaves a round impact mark with small marks called spines protruding from it. The blood spatter from the gutter was round with a degree of elongation. The spines pointed in a particular direction, which Officer Cox found useful in determining the general direction of motion. The blood spatters were not high velocity; high velocity spatter would result in very small droplets, or misting. The blood on the sidewalk had large spines all pointing in the same direction. Officer Cox opined that, based on the direction of the spines on the blood splatter, the general direction of motion of the victim's body was toward the resting location of the victim's body, or toward the credit union from the street.

Officer Ron Trentham was in the motor unit of the Knoxville Police Department but also served as a traffic accident reconstructionist. After *voir dire,* the trial court allowed Officer Trentham to testify as an expert in accident reconstruction. In investigating an accident where the front of a vehicle struck a pedestrian, Officer Trentham would expect to see damage to the front bumper of the car and to the

7

leading part of the hood. He would also expect to see damage on the hood or on the windshield. If a car backed up and struck a pedestrian, he would expect to see contact on the bumper or trunk deck area. Officer Trentham considered dirt on a vehicle to be very important in determining whether a vehicle made contact with another object or person. If he observed damage on a vehicle, it could be previous damage; however, if something touched a dirty vehicle, the impact of the object that touched it will disturb the dirt and make a smear. If a vehicle struck a pedestrian below his or her center of gravity, the body would either be pushed forward or it would go up onto the hood or the windshield. There should be some evidence, such as disturbed dirt, a dent, or contact damage. If a car struck a pedestrian above his or center of gravity, the car would push the pedestrian over and move on top of the body.

When Officer Trentham responded to the scene at the credit union, he believed he was investigating a case involving a pedestrian being struck by a vehicle. Upon arrival, Officer Trentham initially thought that a pedestrian was walking down the sidewalk and was struck by a car entering the parking lot. At that time, he had not yet seen the front of appellant's vehicle. Officer Trentham walked around and surveyed the scene. He noted several drag marks from the edge of the roadway leading toward the final resting spot of the victim and the automobile. He also observed the presence of red drag marks that were consistent with blood. He saw blood drops at the edge of the roadway and blood smear from the sidewalk onto the asphalt area of the parking lot. Officer Trentham found blue drag marks that were consistent with the victim's denim jacket. All of the marks he found started at the edge of the road and led up to the final point of rest of the victim's body and appellant's car. Officer Trentham located a tan or brown scrape mark that was consistent with the victim's skin and the injury pattern the medical examiner found on the victim's lower body. He observed two small black marks that were consistent with the victim's shoes. Again, all of the lines Officer Trentham observed led from the street toward the credit union to the point where the victim's body came to rest. He was able to determine the direction of movement because the marks were darker at the initial points of impact and faded as they moved forward.

Officer Trentham's examination of appellant's vehicle indicated that the dirt around the trunk key had been disturbed. He did not observe any disturbance of dirt around the occupants' sides of the vehicle. He determined that something had disturbed the dirt around the front license plate holder and the lower part of the front bumper. These marks indicated to Officer Trentham that the victim's body was struck from the front as the vehicle moved in a forward direction. He looked under the car with a flashlight and noticed blood on the frame next to the right front wheel. He also saw blue lines that were consistent with the victim's denim jacket. Grease marks and dirt on the victim's jacket were consistent with her clothing coming into contact with the right front wheel area of appellant's car.

As Officer Trentham completed his initial investigation at the crime scene, he observed a cigarette lighter and a clump of hair at the point where he believed that

the victim was initially struck at the curb line. He testified that the driver of the wrecker that towed appellant's car to the Knoxville city impound lot did not enter the vehicle or turn the steering wheel. Officer Trentham further insured that no one disturbed any dirt on the body of the vehicle. He followed the car to the impound lot. He had the car taken into the police garage and placed on a rack so that investigators could observe any further evidence. As part of the reconstruction, Officer Trentham measured the vehicle. At the garage, he observed blood running the length of the vehicle on the passenger side leading to the rear passenger side tire. Just before the rear tire, he noticed a pattern of lines consistent with the victim's jacket on the frame of the car next to the rear tire. While at the garage, Officer Trentham transferred the victim's shoes and the clump of hair to Officer Cox.

Officer Trentham found that the marks on the victim's left shoe were significant in that they were consistent with the victim being dragged across the concrete and asphalt. Officers found the shoestring just beside the driver's door of the vehicle as it came to rest. Officer Trentham gave his expert opinion regarding the point of impact between appellant's car and the victim. Based on the evidence and location of the blood, skin, and blue fibers, he gleaned that, from the point where the victim was struck, she was then pushed by the vehicle. The victim's skin was transferred to the pavement as a result of her jogging pants coming down, exposing her hip area to the concrete, and leaving marks. Officer Trentham's opinion was that the victim was lying on the ground bleeding at the curb line and that the point of impact with appellant's automobile was at the curb line.

L.B. Steele was assigned to the motor traffic unit of the Knoxville Police Department and was Officer Trentham's partner. After *voir dire,* the trial court qualified Officer Steele as an expert in accident reconstruction. On the morning of March 5, 2008, Officer Trentham called Officer Steele and asked him to gather their measuring equipment then proceed to the crime scene. When he first arrived, Officer Steele believed he was responding to an accident involving a vehicle striking a pedestrian. In reviewing the evidence, he and Office Trentham tried to determine how a pedestrian fatality could have occurred because the evidence indicated that the victim had been lying on the ground, or at the very least, was lower to the ground than she was to a standing position. Officer Steele took crime scene measurements with their equipment and loaded the information into the data storage system. He later transferred the data to a computer at the police department and made two discs containing the information. The distance from the first blood drop near the edge of the roadway to the left front tire at its resting position was 34.91 feet.

Special Agent Lisa Wessner was a special agent forensic scientist with the Tennessee Bureau of Investigation ("TBI") crime laboratory, assigned to the forensic serology and DNA analysis unit. In the course of this case, she received a DNA sample from the victim, buccal swabs from appellant, and swabs from appellant's vehicle taken from a sway bar guard, metal sheet, right rear tire, front guard and tubing guard. The sample from the sway bar guard failed to indicate the

presence of blood; the remainder of the swabs from the vehicle contained blood. DNA obtained from the metal sheet, the front guard, and the tubing guard matched the victim's DNA profile. Agent Wessner could not obtain a DNA profile from the rear tire because the DNA was insufficient or degraded. The probability of the DNA belonging to an individual unrelated to the victim exceeded the current world population.

Officer Scott Noe with the Knoxville Police Department responded to a domestic call made by the victim on November 16, 2006. When he arrived, Officer Noe observed that the victim had a black eye. He transported the victim to the commissioner's office so she could sign a warrant against appellant. In the warrant, the victim alleged that she and appellant argued over bus fare, at which time appellant punched her in the eye. Appellant pled guilty to the charge.

The trial court allowed Dr. Darinka Mileusnic–Polchan to testify as an expert witness in forensics. Dr. Mileusnic–Polchan responded to the crime scene at the credit union, where she observed the victim in a supine, or face-up, position under the rear bumper of appellant's car. After reviewing the scene and taking photographs, Dr. Mileusnic–Polchan performed the autopsy of the victim the same day. She took additional detailed photographs of the victim's clothing. Dr. Mileusnic–Polchan opined that in cases such as this, the existence of conflicting information makes it necessary for her to document the case very carefully, because even the smallest finding on the body can prove important in determining what actually happened. Based on her findings, Dr. Mileusnic–Polchan formed the opinion that the victim's manner of death was a homicide.

In most cases involving a pedestrian accident, Dr. Mileusnic–Polchan would expect to see injuries to the lower extremities, specifically the calves, knees, and sometimes the thighs, of the victim. She did not find those injuries on the victim. She examined the victim's body and documented every injury. Dr. Mileusnic–Polchan documented sixty separate injuries. The victim suffered several head and neck injuries, including linear marks on the chin consistent with tire marks. An abrasion by the right eyebrow displayed directionality, indicating that the body was moving against the surface. Dr. Mileusnic-Polchan found blood stains and hair attached to the shoulder of victim's jacket, most likely caused by forced bending of the head over the shoulder.

Dr. Mileusnic–Polchan noted that the victim's right clavicle was broken, and the neck and spine junction was fractured. The fracture was caused by extraordinary force that separated the head from the neck. The tire marks on the victim's neck indicated that the vehicle's rear tire ran over it. This injury was one of the primary causes of the victim's death. The victim also had linear abrasions under and on her right breast. Dr. Mileusnic–Polchan described the injury to the victim's breast area as indicating movement of the victim in a particular direction, and attributed the injury to contact with the front bumper of appellant's vehicle. She analyzed a bruise

pattern and a burn on the victim's body and matched the injuries to a hot part from underneath the car, perhaps part of the exhaust or catalytic converter.

The victim's abdomen sustained a great deal of injury, including "abrasions and stretch abrasions." Dr. Mileusnic–Polchan identified a tire track along the victim's abdominal abrasions. She stated that the tire marks could only have been made by the front tires because the rear tires were bald and could not have left those particular indentations. Dr. Mileusnic–Polchan pointed out a large burn that was over four inches long by two inches across. The skin from that burn was retrieved from underneath the vehicle. She commented on an extensive deep bruise on the right thigh that could only be consistent with the tire crossing the victim's thigh. The victim's pelvis was completely crushed, including the sacrum.

Dr. Mileusnic–Polchan noted that the victim's back was relatively clear of injury, which indicated that she was facing the vehicle with clothing covering her back. The victim did, however, receive a road rash injury to her back and buttocks. In the sacral area, some of the victim's skin was missing. Dr. Mileusnic–Polchan explained that the pattern of the injury established the direction of movement of the victim's body.

As part of her investigation, Dr. Mileusnic–Polchan examined appellant's vehicle at the impound lot. She compared the victim's injuries with the damage to and evidence on appellant's vehicle. Dr. Mileusnic–Polchan found that the evidence and victim's injuries supported the conclusion that the victim was struck by the front of the vehicle.

Dr. Gregory James Davis testified on behalf of appellant as an expert in the field of forensic pathology. He reviewed all of the evidence collected in the case, together with reports from the medical examiner and TBI. In scrutinizing Dr. Mileusnic–Polchan's testimony, Dr. Davis explained that the term "consistent with" merely implies that physical evidence could support a particular scenario; the term itself does not mean that the scenario or story is true. Dr. Davis explained that while the evidence is consistent with the classification of the victim's death as a homicide, it is also consistent with other classifications.

Based on his review of the evidence, Dr. Davis could not offer an opinion as to whether appellant intended to inflict harm on the victim, nor could he confirm that the victim's injuries were unidirectional. The injuries were consistent with being unidirectional but were not indicative or diagnostic of them being unidirectional. Dr. Davis disputed Dr. Mileusnic–Polchan's finding that the injury on the victim's face was consistent with being run over by the tire of the car. If her face had been run over by a car, he would have expected to find more fractures to the jaw and skull. Dr. Davis believed that the victim's death should have been classified as "undetermined" or "not determined." His view of the physical evidence was that the evidence was consistent with appellant's backing over the victim. The injuries sustained by the victim, specifically the wrist fracture and the abrasions on both

11

hands, were consistent with her walking away from the vehicle, falling, and being struck by appellant's vehicle.

James Alan Parham, a civil engineer with Parham Engineering Consultants, testified on behalf of appellant. Mr. Parham's primary focus was on highway design and transportation safety. The trial court allowed him to testify as an expert in accident reconstruction. In preparing for this case, Mr. Parham reviewed all of the evidence, reports, and photographs. He also visited the scene of the incident on more than one occasion and examined appellant's automobile. Mr. Parham generally agreed with many of Officers Trentham's and Steele's findings. However, Mr. Parham opined that the absence of black scrape marks and scuffs going toward Magnolia Avenue does not rule out the possibility that the victim's body was dragged in that direction. Because of the downhill slope of the parking lot, a body would not offer much resistance to being pushed. Also, the asphalt would offer less friction force on a body than would the sidewalk.

Although Mr. Parham agreed that the victim was not standing at the time of impact, he disagreed with the officers' findings that the victim was pushed by appellant's automobile and dragged until her body was dislodged under the right rear tire. He stated that the police department did not sufficiently document the vehicle in order for him to determine the presence of dirt rub on the trunk, hood, or bumpers of appellant's vehicle. Mr. Parham did not find the photograph of the front license plate to be conclusive of dirt rub or interaction with a person. He did not find dirt rub documented anywhere on the topside of the vehicle but found dirt rub underneath the vehicle itself. Mr. Parham identified dirt rub on the undercarriage of appellant's automobile. He did not believe that the officers' opinions that the victim was struck in one direction could be proven by the evidence.

Mr. Parham testified that his examination of appellant's car was limited because the car had been stored outdoors exposed to weather. He disagreed with Officer Steele about the importance of storing the vehicle under cover, stating that in a low-impact case the data is very fragile. Mr. Parham believed that one rain incident could compromise the evidentiary value of the car.

Mr. Parham placed great value on the location of the victim's broken shoelace. In his opinion, the shoelace was broken due to a forceful break, such as a tire pinning the shoelace to the ground as the body is being dragged. The location of the shoelace indicated to him that the victim's body had to be at the point where the shoelace was recovered when it was struck. The shoelace would not have held such value to him if it were located closer to Magnolia Avenue or if the body was located beyond the shoelace. Based on the evidence and appellant's theory of the incident, Mr. Parham offered the opinion that the physical evidence was consistent with appellant's explanation of the incident.

*State v. Cornwell*, No. E2011-00248-CCA-R3-CD, 2012 Tenn. Crim. App. LEXIS 868, at *4-33

(Tenn. Crim. App. Oct. 25, 2012) ("*Cornwell I*"). The jury convicted Petitioner of the lesser-

included offense of second-degree murder [Doc. 14-1 p. 89]. Considering his status as a multiple offender, the court then sentenced Petitioner to thirty-five years of confinement to the Tennessee Department of Correction [*Id.* at 90]. Petitioner filed an appeal, arguing eight points of trial court error: the trial court (1) failed to remediate the State's failure to preserve the evidence on Petitioner's vehicle; (2) allowed the State to elicit improper testimony from the medical examiner, which had been withheld from counsel; (3) improperly qualified responding officers as accident reconstruction experts; (4) allowed improper closing arguments not supported by the evidence; (5) improperly ruled that evidence provided by Anthony and Stephanie Anderson was proven by clear and convincing evidence; (6) allowed testimony by witnesses whose previous statements had been withheld; (7) allowed the victim's previous complaint of domestic violence against Petitioner to be read to the jury; and (8) erred in determining the appropriate term of years for Petitioner's sentencing [Doc. 14-18]. The TCCA affirmed Petitioner's conviction [Docs. 14-21, 14-22] and the Tennessee Supreme Court ("TSC") declined discretionary review [Doc. 14-24].

Petitioner next filed a *pro se* petition for post-conviction relief [Doc. 14-25, p. 5-12]. The post-conviction court appointed counsel who filed an amended petition [*Id.* at 14-20]. Petitioner then retained counsel who filed a memorandum in support of both Petitioner's *pro se* petition and prior counsel's amended petition [*Id.* at 43-135]. The court held an evidentiary hearing where the following evidence was adduced:

### [1]. Former Judge Richard R. Baumgartner

Former Judge Richard R. Baumgartner presided over the Petitioner's trial court proceedings. During the time that the Petitioner's case was pending in the trial court, Judge Baumgartner "was taking opiate pain killers." According to the subsequent investigation, Judge Baumgartner began getting multiple prescriptions for these narcotics from multiple doctors in 2008. In 2009, Judge Baumgartner approached Deena Castleman, a former offender in the Knox County Drug Court program that Judge Baumgartner oversaw, and asked her to "procure hydrocodone for him." United States v. Baumgartner, 581 Fed.Appx. 522, 525 (6th Cir. 2014).

From that point, Judge Baumgartner regularly gave Ms. Castleman "money to procure pills for him" and even "bought her a cellphone to facilitate the transactions." Baumgartner, 581 Fed.Appx. at 525. Eventually, Judge Baumgartner and Ms. Castleman began "a sexual relationship." Id. Ms. Castleman revealed the identities of her suppliers to Judge Baumgartner and introduced him to one of the suppliers, whom Judge Baumgartner "began dealing [with] directly." Id. Until his arrest in 2011, Judge Baumgartner also attempted to intervene on Ms. Castleman's behalf with other judges, a nonprofit housing director, and a prosecutor. Id. at 525–26.

The Petitioner's lead trial counsel testified at the post-conviction hearing that he was the elected District Public Defender for the Sixth Judicial District. Lead counsel further testified that as the District Public Defender, he regularly appeared before Judge Baumgartner. Initially, lead counsel "enjoy[ed] trying cases in front of" Judge Baumgartner and thought Judge Baumgartner "was a very good judge" who "wanted to be challenged intellectually" by novel legal issues.

However, lead counsel noticed a change in Judge Baumgartner's demeanor in 2008 and 2009. Lead counsel testified that Judge Baumgartner became "aggressive," "snarky," "disrespectful," and "snipey." According to lead counsel, Judge Baumgartner started making "unprofessional" personal comments about lawyers in his courtroom. Lead counsel believed that Judge Baumgartner's behavior was directed mostly at defense counsel and that "the [S]tate's side got the benefit of the doubt." Lead counsel candidly admitted that he "still harbor[ed] a good bit of hostility toward [Judge Baumgartner] over the way he changed and the way he treated" the defense bar.

Lead counsel noted that the Petitioner's case was tried in May 2009. Lead counsel testified that during the pretrial phase, he thought Judge Baumgartner had trouble "manag[ing] the lawsuit." Specifically, lead counsel complained that he "couldn't get [Judge Baumgartner] to schedule [and hold] hearings." Lead counsel further testified that Judge Baumgartner could not "recall from one hearing to the next ... what [they] were there for and ... what had happened at the last hearing." Lead counsel also stated that Judge Baumgartner's rulings before and during the trial, in his opinion, "didn't make any sense."

Lead counsel testified that Judge Baumgartner's condition appeared to be worse during the hearings on the Petitioner's motion for new trial. Specifically, lead counsel recalled that his impression from the last motion for new trial hearing was that Judge Baumgartner "was paying no attention ... to what was going on" and was "[v]ery" confused.

However, lead counsel admitted that he could not recall anything during the proceedings in the Petitioner's case that caused him to think that Judge Baumgartner was "under the influence of something." For example, lead counsel

14

did not recall Judge Baumgartner ever slurring his speech, laying his head down, closing his eyes, falling asleep, or appearing "to lose interest." Lead counsel also admitted that in an interview with the Knoxville News–Sentinel in February 2011, he stated that he thought the "fallout" from Judge Baumgartner's misconduct and subsequent arrest would be "minimal."

Co-counsel testified that he had been the District Public Defender's Office's supervisor for Judge Baumgartner's courtroom and that he was in Judge Baumgartner's courtroom "every day." Initially, co-counsel thought that Judge Baumgartner was "highly analytical," "very intelligent," "fair to both sides," and "kept good control of his courtroom." Over time, however, co-counsel thought "Judge Baumgartner seemed to be less happy, less attentive, more prone to anger, [and] certainly a lot less patient." Co-counsel noted that Judge Baumgartner's irritation "was directed at ... members of the bar, ... his own court officer[,] and witnesses."

Other than Judge Baumgartner's general irritation, co-counsel did not recall "anything that [Judge Baumgartner] did in the courtroom that would indicate that he was under the influence during [the Petitioner's] trial." Co-counsel also could not "point to anything about Judge Baumgartner's behavior specific to this case that ... would indicate that he wasn't paying attention." Specifically, co-counsel could not recall ever seeing Judge Baumgartner with his head down or sleeping during the proceedings.

Co-counsel did recall that at the last hearing on the Petitioner's motion for new trial, Judge Baumgartner was "particularly distracted" and "appeared not to be focused ... at all." Co-counsel testified that this was the only day of the proceedings when he thought "[s]omething was wrong" with Judge Baumgartner. Co-counsel noted that after the hearing, Judge Baumgartner entered a short written order denying the Petitioner's motion for new trial stating that "[t]he verdict of the jury [was] specifically approved by the court."

Walter Davis testified that he was an investigator at the District Public Defender's Office and that at the time of the Petitioner's trial, he had been recently hired as a legal assistant to lead counsel. Mr. Davis worked with lead counsel on the Petitioner's case. Mr. Davis testified that he thought Judge Baumgartner "appeared like he was bored and he wasn't paying attention" during the Petitioner's trial. Mr. Davis further testified that he "noticed several times" that Judge Baumgartner would "have his head in his hand[s]," but he was unsure if Judge Baumgartner was asleep during those times. Mr. Davis also testified that Judge Baumgartner "seemed really confused" at the last motion for new trial hearing and that lead counsel and co-counsel were "concerned" about Judge Baumgartner after the hearing.

The Petitioner testified that he saw Judge Baumgartner with his eyes closed and asleep on "a few occasion[s]" during his trial. However, the Petitioner admitted that he never told lead counsel or co-counsel about these alleged incidents. The

Petitioner also testified that during one of the motion for new trial hearings, he saw Judge Baumgartner with his eyes closed and "a stupid grin on his face." The Petitioner claimed that he recognized the look on Judge Baumgartner's face from his personal experience of "get[ting] high." However, the Petitioner admitted that he did not think that Judge Baumgartner was intoxicated at the hearing. The Petitioner only came to that conclusion after reading news reports about Judge Baumgartner's misconduct. The Petitioner also recalled that Judge Baumgartner seemed "confused and shaky" at the last motion for new trial hearing.

### [2]. Inspection of the Petitioner's vehicle and alleged Ferguson violation

Lead counsel testified that his office was appointed to represent the Petitioner shortly after the Petitioner was charged. However, lead counsel testified that he waited to inspect the Petitioner's vehicle until after he had received funding for an expert in accident reconstruction. Upon inspecting the vehicle, lead counsel learned that "[i]t had been stored outside at the impound lot" and was exposed to the elements.

Lead counsel recalled that his expert, Mr. Parham, told him that "the weather and elements had affected [the car] to the point where ... there was really nothing [they] could do to determine what the condition of the vehicle was at the time" of the incident. Contrary to the trial record and this court's opinion on direct appeal, lead counsel recalled that Mr. Parham "was unable to render an opinion" on the direction the car was traveling "based on the condition of the car at the time he inspected it."

As a result of his discovery that the Petitioner's car had been stored outside, lead counsel filed a motion based on State v. Ferguson, 2 S.W.3d 912 (Tenn. 1999), seeking to have the indictment against the Petitioner dismissed. Lead counsel admitted that dismissal was the only remedy he sought in his Ferguson motion. Lead counsel testified that the decision not to seek other remedies in his Ferguson motion, such as a limiting jury instruction or suppression of any evidence regarding the "dirt rub" on the front of the vehicle, was not a tactical decision.

According to lead counsel, part of the reason he only sought a dismissal of the indictment was because he was frustrated that he "was having trouble getting [the Ferguson motion] heard." Lead counsel explained that Judge Baumgartner unexpectedly rescheduled the hearing "a couple of different" times. Lead counsel further explained that he got "the impression that [Judge Baumgartner] had prejudged the issue" when the hearing was finally held.

However, the trial record showed that lead counsel's Ferguson motion was filed on March 17, 2009, and the trial court held a hearing regarding the motion on March 27, 2009. The trial court denied the motion, concluding that there was not a Ferguson violation because the underside of the vehicle had been preserved and there were photographs of the alleged dirt rub.

Lead counsel raised the Ferguson issue again at a hearing the Friday before the Petitioner's trial began. Specifically, lead counsel asked the trial court "to consider the other remedies [available for a Ferguson violation], particularly [a] jury instruction."1 However, the trial court reiterated that it denied the motion because it did not believe there had been a Ferguson violation. Lead counsel testified that he did not renew his request for a Ferguson jury instruction at the end of the Petitioner's trial.

### [3]. Dr. Mileusnic–Polchan's testimony

Lead counsel testified that after he received Dr. Mileusnic–Polchan's autopsy report, he retained Doctor Randall Pedigo as a consulting expert and sent Dr. Pedigo the report. Lead counsel explained that Dr. Pedigo was the former Knox County Medical Examiner, but that Dr. Pedigo had lost his medical license due to "some criminal convictions." Dr. Pedigo arranged a meeting between the Petitioner's defense team and Dr. Mileusnic–Polchan at her office to discuss the autopsy report. Lead counsel, co-counsel, Mr. Davis, and Dr. Pedigo were all present at the meeting with Dr. Mileusnic–Polchan.

Lead counsel testified that during the meeting, he asked Dr. Mileusnic–Polchan to explain "the injuries indicated in the autopsy" report and the correlating photographs from the autopsy. Near the end of the meeting, lead counsel asked Dr. Mileusnic–Polchan to explain a pattern of injuries on the victim's abdomen. Lead counsel recalled that Dr. Mileusnic–Polchan explained "that there was an item underneath the car[, the heat shield,] that had slats on it" that "were angled." Dr. Mileusnic–Polchan further explained that "as the car traveled over the body it was ... like a cheese grater in that those slats rubbed against ... the skin and caused this pattern injury."

Lead counsel recalled that as Dr. Mileusnic–Polchan was explaining this, he noticed co-counsel looking through a binder of photographs of the Petitioner's car. According to lead counsel, co-counsel then confronted Dr. Mileusnic–Polchan by stating that "the car would have had to have been backing over" the victim "in order for that cheese grater effect to have left that pattern injury on her body." Lead counsel recalled that Dr. Mileusnic–Polchan "stopped what she was saying" and there was an "uncomfortable pause." According to lead counsel, Dr. Mileusnic–Polchan then stated that "it would depend on which angle the slats ... were running, whether they were running backwards or forwards," and that she would need to look at the car even though co-counsel confronted Dr. Mileusnic–Polchan with three photographs he thought showed that "those slats [ran] towards the back of the car."

Lead counsel testified that the defense team left the meeting with Dr. Mileusnic–Polchan and "celebrated" because they were all under the impression that her description of the "cheese grater effect" had "confirmed what [the Petitioner] said happened." Lead counsel admitted that Dr. Mileusnic–Polchan did not say that the

Petitioner's car had backed over the victim. However, lead counsel reiterated that by "the way [Dr. Mileusnic–Polchan] was describing the cheese grater effect, there was no doubt in anyone's mind she was describing the car going backwards."

Co-counsel recalled that going into the meeting with Dr. Mileusnic–Polchan, the defense team was not sure what had caused the pattern injury to the victim's abdomen but that the "heat shield was already a suspect," and they wanted to ask Dr. Mileusnic–Polchan about the injury. According to co-counsel, Dr. Mileusnic–Polchan "related those injuries directly to" the slats on the heat shield, "indicating that as the vehicle traveled over the body, that would be the ... type of injuries she would expect to see from that shape of an object."

Co-counsel explained that he was "a car guy" and that he was confident the slats on the heat shield "were bent toward[s] the back" of the Petitioner's car. Contrary to lead counsel's recollection, co-counsel recalled that he "was just watching" as lead counsel questioned Dr. Mileusnic–Polchan at the meeting. Co-counsel testified that he thought Dr. Mileusnic–Polchan "was saying that she believed that based on [the victim's abdominal injuries], that the vehicle was traveling backwards."

Co-counsel further recalled that he "explained to" lead counsel "what [he] thought [he] was hearing" about the direction of the slats while Dr. Mileusnic–Polchan was out of the room. According to co-counsel, lead counsel then asked Dr. Mileusnic–Polchan about the heat shield again and Dr. Mileusnic–Polchan "maintained ... [her] earlier statement ... that the vehicle was traveling ... in a reverse manner." Co-counsel testified that he thought Dr. Mileusnic–Polchan started to "get a little concerned about ... the level of [their] interest in those photographs and what those [injuries] meant." So, co-counsel believed that Dr. Mileusnic–Polchan "reserved a final opinion on the subject until she had had an opportunity to look at that car."

Mr. Davis recalled that co-counsel told Dr. Mileusnic–Polchan during the meeting that if the injuries to the victim's abdomen had been caused by a "cheese grater effect," it supported the Petitioner's version of events. Mr. Davis testified that Dr. Mileusnic–Polchan "sort of became defensive" and disagreed with co-counsel's assertion. According to Mr. Davis, co-counsel then showed Dr. Mileusnic–Polchan a picture of the heat shield and "she said she would have to go back out to the scene to look at it."

Despite having the autopsy report and having met with Dr. Mileusnic–Polchan, lead counsel claimed that he "didn't really know what" opinions she would offer at trial. Lead counsel explained that the autopsy report merely "describe[d] the injuries" and that Dr. Mileusnic–Polchan was "very careful" when interviewed "not to volunteer anything." According to lead counsel, Dr. Mileusnic–Polchan would only provide "answers to [his] specific questions" and did not provide any information about "what opinion [she was] going to offer as an expert." However, lead counsel admitted on cross-examination that he asked for a continuance to retain an expert in forensic pathology after the meeting with Dr. Mileusnic–Polchan because he had

18

learned that she would opine that all of the victim's injuries were "unidirectional" and that her testimony would be consistent with the State's theory of the case.

Nonetheless, lead counsel filed a motion for a hearing pursuant to <u>McDaniel v. CSX Transportation, Inc.</u>, 955 S.W.2d 257 (Tenn. 1997). Lead counsel explained that he filed the motion in order to learn at the hearing what Dr. Mileusnic–Polchan would testify to at trial and to examine "whether there [was] science to support [her] opinion[s]." Lead counsel admitted that he did not request the hearing to challenge Dr. Mileusnic–Polchan's qualifications, but rather to challenge her opinions that the victim's death was a homicide and that the victim's injuries were "unidirectional."

Lead counsel testified that he did not attach a "countervailing expert opinion" to his motion because he "[d]idn't think to do it." Lead counsel claimed that the prosecutor and Judge Baumgartner kept postponing the hearing and that they "never got around to it" prior to trial. Co-counsel also testified that it was "hard to get ... a full-blown, meaningful [<u>McDaniel</u>] hearing out of Judge Baumgartner" and that he felt "[u]nprepared" going into trial with respect to Dr. Mileusnic–Polchan's testimony. Instead, Judge Baumgartner agreed to hold a jury-out hearing prior to Dr. Mileusnic–Polchan's testimony.

Co-counsel testified that the defense team "agonized over how to use [the] information [from their meeting with Dr. Mileusnic–Polchan] and whether it was going to hold up in trial." Co-counsel further testified that the defense team was aware of how they "might suffer if ... [they had] misinterpreted [the meeting] or if [Dr. Mileusnic–Polchan] changed her testimony." Specifically, co-counsel worried that they had misinterpreted what Dr. Mileusnic–Polchan had told them during the meeting. Nevertheless, the defense team prepared to cross-examine her about the meeting.

During his opening statement, lead counsel raised the defense team's meeting with Dr. Mileusnic–Polchan as follows:

> And then you're going to hear from Dr. Darinka Mileusnic[Polchan]. Dr. Darinka Mileusnic[–Polchan] is the medical examiner here in town, and she's going to tell you two things. She's going to tell you she classified this, the manner of death here is homicide, and she's going to tell you that all the injuries that [the victim] sustained were unidirectional. They were caused— they were inflicted in one direction.

> When I went to interview Dr. Mileusnic[–Polchan] to get ready for this trial, you saw a picture of [the victim], the stomach, the open torso of [the victim], and you saw a black mark that runs up her side that almost looks like a ladder, two brown marks with connecting slats, and when I was talking to Dr. Mileusnic [–Polchan], I asked

19

her, I said, "What would have caused that injury? What is that injury?" And, very frankly, she told me. She said, "Well, that's pretty easy. There's a heat shield underneath that car .... If you'll look at that heat shield real carefully," she said, "that heat shield has slats and they're angled," and she said, "you know, an analogy would be a cheese grater. You know how a cheese grater has slats, and when you drag it over the cheese, it cuts the cheese. That's what made that mark on her body. As it drug over her body, it made those slashing marks."

[Co-counsel] was there for that interview with me, and [co-counsel] says, "But, Doctor, that cheese grater, that heat shield slants towards the back of the car," and she says, "Well, I'd have to reorient myself on that piece," and he had a picture with him, and he showed it to her, and he said, "The slants move in an angle backwards. If the car went over her forward, by the cheese grater analogy, it wouldn't leave any mark on her at all. It would go over her without leaving any mark. The car would have to go backward in order for that cheese grater effect to happen." And she said, "Well, I'll have to check my orientation on that."

So we'll hear from Dr. Mileusnic[–Polchan] this week. We'll ask her about her orientation on that cheese grater analogy, and it will be interesting to see whether Dr. Mileusnic[–Polchan] has changed her opinion about whether or not that cheese grater heat shield effect could only have occurred on her as the car was backing up toward Magnolia Avenue just precisely the way [the Petitioner] said the accident occurred.

Prior to Dr. Mileusnic–Polchan's testimony, the trial court held a jury-out McDaniel hearing at which Dr. Mileusnic–Polchan and Dr. Davis testified. Lead counsel claimed that Dr. Mileusnic–Polchan offered twenty-six opinions during the jury-out hearing that he was hearing "for the first time." Co-counsel testified that he believed they did not hear all of the opinions Dr. Mileusnic–Polchan would ultimately testify about in front of the jury during the McDaniel hearing. Lead counsel claimed that the jury was "immediately" brought back into the courtroom after the jury-out hearing.

Lead counsel further claimed that he was unable to concentrate on Dr. Mileusnic–Polchan's testimony and was hesitant to raise objections because he was overwhelmed by what he had heard during the jury-out hearing immediately before. Lead counsel also claimed that he did not have the opportunity to speak to his expert witness, Dr. Davis, before Dr. Mileusnic–Polchan's testimony to the jury. However, the trial court record contradicted lead counsel's recollections of the jury-out hearing. At the conclusion of the jury-out hearing, the trial court recessed for

the day, and Dr. Mileusnic–Polchan did not testify in front of the jury until the next morning.

Lead counsel testified that he tried to impeach Dr. Mileusnic–Polchan "with ... the conversation that [they] had in her office" because she had testified that the injuries to the victim's abdomen were "caused the opposite way that she explained it in her office." However, Mr. Davis recalled that during Dr. Mileusnic–Polchan's trial testimony, she had "stuck ... to her version" and continued to disagree "with what [co-counsel] had pointed out" during the pretrial meeting.

During cross-examination, lead counsel brought up the defense team's pretrial meeting with Dr. Mileusnic–Polchan and the "cheese grater effect." The following exchange then occurred:

> [Lead counsel]: And that did not happen, you're right. And so after our discussion and after you telling us that the car would have had to have backed over her in order to make that pattern, the cheese grater analogy, Dr. Mileusnic[–Polchan], you told us if it went with the slats, it would not leave a pattern on her skin. If it went against her, it would leave the pattern that is indicative in the picture?
>
> [Dr. Mileusnic–Polchan]: No. Actually, what—just what statement made was a lie. I never said that the car backed over the lady. I never ever said that this car backed over Ms. Cornwell. Never ever said—
>
> [Lead counsel]: Dr. Mileusnic[–Polchan]—
>
> [Dr. Mileusnic–Polchan]: Please let me finish. It was a lie. I never said that the car backed over Ms. Cornwell. What I said is that the cheese grater in one direction would leave one set of injuries. In the opposite direction would be definitely different sort of injuries because of the orientation of the slats. Because I never heard from the defense team again, I went myself to see what direction was and how sharp it was. So that's why we're discussing it today.
>
> [Lead counsel]: Dr. Mileusnic[–Polchan], you never told us that the car backed over Leoned Cornwell. You are correct there. The cheese grater analogy you gave us was if the car passed over her in the direction of the slat, it would not leave a mark. The cheese grater analogy was that it had to go—her body had to go against the slat to leave the pattern. You did not ever say that it went backwards. You didn't know which angle the slats went to?
>
> [Dr. Mileusnic–Polchan]: Exactly, because I didn't know, because of the angle, I couldn't ever actually even say or—or state that I know for a fact that one direction leave no marks whatsoever, and

yet the other would leave marks. That was the whole point of conversation, the whole point of having agreement that we would look at it together. Because it never happened, I went to look at it. So having in mind that the car is—pressed under that car, one direction would leave one set of marks. How intense that would be, I don't know until I looked at it again. The other direction would definitely cut the body.

Lead counsel testified that he felt like his "head was about ready to explode" when Dr. Mileusnic–Polchan said his statement was a lie. Lead counsel explained that he took her statements to mean that she was calling him a liar in front of the jury. Lead counsel recalled that Dr. Mileusnic–Polchan was "animated" during this exchange. Lead counsel testified that Judge Baumgartner did "nothing" during the exchange. Lead counsel admitted that he did not object to Dr. Mileusnic–Polchan's statements or request a mistrial. Lead counsel testified that his failure to object or request a mistrial was not a strategic decision. Lead counsel admitted that even after his exchange with Dr. Mileusnic–Polchan, he continued to cross-examine her for several minutes.

The Petitioner recalled that Dr. Mileusnic–Polchan "got really upset and told [lead counsel] that he was a liar" when lead counsel brought up the "cheese grater effect." The Petitioner further recalled that Dr. Mileusnic–Polchan "was real aggressive on the stand" and that lead counsel "back[ed] up" during the exchange and then "drifted off" the topic. Mr. Davis recalled that lead counsel's cross-examination of Dr. Mileusnic–Polchan "got pretty heated" and that he thought Dr. Mileusnic–Polchan "was pretty angry" when she said lead counsel's statement was a lie because "she felt that she was being accused of something."

Dr. Davis was also present in the courtroom during Dr. Mileusnic–Polchan's testimony and he testified at the post-conviction hearing that he would "never forget" the exchange because he had "never heard ... anything like that in [a] court before or since." Co-counsel recalled that Dr. Mileusnic–Polchan was "very animated" during the exchange. Co-counsel testified that the exchange "was a very ugly moment" and that he had "never seen anything like" it. Co-counsel further testified that he thought the exchange affected the remainder of lead counsel's cross-examination, that lead counsel had a "deer in headlights" look, and that the exchange "threw [lead counsel] off track."

Lead counsel recalled that there was a recess after his cross-examination of Dr. Mileusnic–Polchan. Lead counsel testified that he felt he "needed to deal with" Dr. Mileusnic–Polchan's statements. However, lead counsel decided that he could not call Dr. Pedigo to testify because of Dr. Pedigo's criminal history. Lead counsel also decided that it would not be "fair" to call Mr. Davis to the stand because Mr. Davis "had just joined the staff" at the District Public Defender's Office. With that in mind, lead counsel "felt like [he] needed to call" co-counsel to rebut Dr. Mileusnic–Polchan's testimony about the pretrial meeting.

Lead counsel testified that during the recess, he and co-counsel met with the prosecutor and Judge Baumgartner in Judge Baumgartner's chambers to discuss the situation because he thought there might be "an [ethical] issue calling co-counsel to testify." Lead counsel recalled that when he told Judge Baumgartner that he was planning on calling co-counsel as a witness, Judge Baumgartner told him "not [to] do that." Lead counsel explained that Judge Baumgartner "said the jury would hate [him] for doing that."

Lead counsel testified that he "listened to" Judge Baumgartner's advice and then went outside to think "about what [he] should do." Lead counsel further testified that he "convinced [himself]" that he "was going to make a bad situation worse" by calling co-counsel as a witness and that he "could handle" the situation without doing so. Lead counsel admitted that he never requested a jury-out hearing to make an offer of proof of what co-counsel's testimony would have been.

Lead counsel testified that his decision not to call co-counsel as a witness or make an offer of proof was not a tactical decision. Lead counsel further believed that he had provided ineffective assistance of counsel to the Petitioner in his handling of Dr. Mileusnic–Polchan's testimony. Lead counsel also believed that his handling of Dr. Mileusnic–Polchan's testimony prejudiced the Petitioner because her testimony "was [the] critical issue in the case." Co-counsel testified that Dr. Mileusnic–Polchan "was viewed by the defense as being possibly the most powerful witness." However, co-counsel admitted that even if Dr. Mileusnic–Polchan had been discredited, there was other "corroborating evidence" and that the State's other expert witnesses also testified that the victim was "hit with the front of the [Petitioner's] car and ... [run] over."

Co-counsel recalled that he had "a rather extensive conversation" with lead counsel about how to respond to Dr. Mileusnic–Polchan's testimony during the recess. Due to the ethical concerns of having one of the Petitioner's attorneys become a witness at trial, lead counsel and co-counsel "wanted to get ... Judge Baumgartner involved." Co-counsel explained that "[i]t was a mind-blowing judgment call that [they] were being required to make under circumstances [when] [they] were still stunned." Co-counsel further explained that they "were looking for some guidance from the court" and that they "wanted someone to tell [them] 'yes' or 'no.'"

Co-counsel testified that he "was kind of leaning toward" testifying because they "didn't have any other way to refute" Dr. Mileusnic–Polchan's testimony. However, co-counsel "didn't trust [his] opinion at that point" and "was second-guessing [himself] through the whole process" because he was so stunned by what had occurred. Co-counsel recalled that Judge Baumgartner "was clearly leaning the other way." Judge Baumgartner told them that they "shouldn't do that" because it would "be confusing" and "possibly upsetting" to the jury. Judge Baumgartner told them that he thought that it would not "work out well for [them]" and that "it could make [them] look" even worse.

23

Dr. Davis testified at the post-conviction hearing on the Petitioner's behalf. Dr. Davis explained that he had been "bothered" by this case since the trial in 2009 because he believed that Dr. Mileusnic–Polchan "went beyond the bounds not only of her expertise, but of forensic pathology in general in offering opinions that did not have a basis in sound forensic pathology practice." Dr. Davis further explained that Dr. Mileusnic–Polchan "came across to [him] in her testimony as an advocate for the prosecution" rather than an impartial expert.

Specifically, Dr. Davis took issue with Dr. Mileusnic–Polchan's testimony that the victim's head had been run over by one of the car's tires, her "opinion on the direction of travel of the vehicle," her "offering of an opinion of intent," and her testimony that the victim "definitively ... was not under the influence of marijuana" when the victim was killed without any discussion of "the hangover effects of marijuana." However, Dr. Davis admitted that he testified at trial about his disagreement with Dr. Mileusnic–Polchan's opinions regarding the tire running over the victim's head, the direction the car was traveling, and the Petitioner's intent to harm the victim. Dr. Davis also admitted that he testified about the fact that a "marijuana metabolite" was found in the victim's blood sample, but he did not testify "about the residual effects of marijuana."

Dr. Davis testified that there were "portions of [Dr. Mileusnic–Polchan's] opinion[s]" that he heard for the first time during her trial testimony. Dr. Davis further testified that he was not able to assist lead counsel in preparing to cross-examine Dr. Mileusnic–Polchan because he "didn't hear the full scope of [Dr. Mileusnic–Polchan's] opinion until she was testifying at trial."

*Cornwell v. State*, No. E2016-00236-CCA-R3-PC, 2017 Tenn. Crim. App. LEXIS 994, at \*14-40 (Tenn. Crim. App. Dec. 1, 2017) ("*Cornwell II*") (*footnotes omitted*).  The post-conviction court denied Petitioner relief [Doc. 14-25 p. 139-157].   Petitioner appealed, arguing (1) Judge Baumgartner's illegal activities and abuse of his power as a jurist constituted a structural error and violated Petitioner's right to due process under *Bracy v. Gramley*, 520 U.S. 899 (1997); (2) trial counsel was ineffective for failing to examine Petitioner's vehicle in a timely manner; and (3) "through trial counsel's deficiencies as well as the trial judge's failure to effectively manage the case, the defense was ambushed with and failed to effectively counter critical forensic pathology testimony at trial" [Doc. 14-33].  The TCCA affirmed finding ultimately Petitioner could not show that (1) Judge Baumgartner's conduct actually affected Petitioner's trial, (2) he was prejudiced by

24

counsel's timing in examining Petitioner's car, or that (3) his counsel was deficient in his handling of Dr. Mileusnic-Polchan's trial testimony. *Cornwell II*, 2017 Tenn. Crim. App. LEXIS 994, at *45-72. The TSC again denied Petitioner permission to appeal [Doc. 14-39].

Petitioner then filed the instant petition [Doc. 1]. After Respondent filed his answer [Doc. 15], Petitioner filed his reply [Doc. 20]. This matter is now ripe for review.

## II. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified in 28 U.S.C. §2254, a district court may not grant habeas-corpus relief for a claim that a state court adjudicated on the merits unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d)(1), (2). This standard is intentionally difficult to meet. *Woods v. Donald*, 575 U.S. 312, 316 (2015) (quotation marks omitted). A district court may only grant habeas relief under the "contrary to" clause if the state court decides a question of law or a materially indistinguishable set of facts conversely to the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000). To grant habeas relief under the "unreasonable application" clause, the Court must find that the state court's decision was an "objectively unreasonable," and not simply an erroneous or incorrect, application of the correct legal principle to the facts. *Id.* at 409-11. The AEDPA likewise requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). When the record supports the state court's findings of fact, those findings

are entitled to a presumption of correctness which may be rebutted only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

In addition to the stringent standard for succeeding on the merits of a claim, the grant of habeas relief is further restrained by exhaustion requirements and the doctrine of procedural default. 28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). For a claim to be considered on habeas review, the petitioner must first exhaust state remedies for that claim. 28 U.S.C. §2254(b)(1). Exhaustion requires a petitioner to "fairly present," each federal claim to all levels of the state appellate system, meaning he presented the "same claim under the same theory" up to the state's highest court, *Wagner v. Smith*, 581 F.3d 410, 414, 418 (6th Cir. 2009), to ensure that states have a "full and fair opportunity to rule on the petitioner's claims," *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990); *see O'Sullivan*, 526 U.S. at 842. Tennessee has determined that presentation to the TCCA will satisfy the requirement of presentation to the state's highest court. Tenn. S. Ct. R. 39. If a claim has never been presented to the highest available state court and is now barred from such presentation by a state procedural rule, that claim is procedurally defaulted and barred from federal habeas review. *Coleman v. Thompson*, 501 U.S. 722, 732 (1991). Procedural default may also occur when a petitioner presented the claim to the highest court, but the state court was prevented from "reaching the merits of the petitioner's claim" because petitioner failed to comply with an applicable state procedural rule, which is regularly enforced and is an "adequate and independent" state ground. *Id.* (citing *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986)); *Seymour v. Walker*, 224 F.3d 542, 549–50 (6th Cir. 2000) (citing *Wainwright v. Sykes*, 433 U.S. 72, 80, 84–87 (1977)).

Procedurally barred claims may be considered on their "merits only if the petitioner establishes (1) cause for his failure to comply with the state procedural rule and actual prejudice

from the alleged violation of federal law or (2) demonstrates that his is 'an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent.'" *Wallace v. Sexton*, 570 F. App'x. 443, 452 (6th Cir. 2014) (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)); *see House v. Bell*, 547 U.S. 518, 536 (2006). To show sufficient "cause," Petitioner must point to "some objective factor external to the defense" that prevented him from raising the issue in his first appeal. *Murray*, 477 U.S. at 488. To demonstrate prejudice, Petitioner must show that the inadequacies worked to his "actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982). The prejudice requirement is not met where there is strong evidence of a petitioner's guilt and lack of evidence for his claim. *Id.* at 172.

### III.  ANALYSIS

In his petition, Petitioner raises four claims: (1) that he was denied due process when the State failed to preserve key evidence; (2) that he received ineffective assistance of trial counsel and that the post-conviction court erred in considering trial counsel's errors in isolation; (3) that he was denied a fair trial where his trial judge was later charged with corruption and misconduct; and (4) Tennessee Supreme Court Rule 13 § 5 is a violation of the Due Process and Equal Protection Clauses [Doc. 1]. Respondent contends Petitioner was not denied due process or a fair trial, that his counsel was not ineffective, and that his claim regarding TSC Rule 13 is procedurally defaulted and thus not entitled to review by this Court [Doc. 15]. The Court agrees and finds that Petitioner is not entitled to habeas relief.

### A.  Failure to Preserve Evidence

Petitioner argues that he was denied due process when the State mishandled and failed to preserve the evidence on his vehicle [Doc. 1 p. 40-45]. Specifically, Petitioner claims that his

vehicle, which was a crucial piece of evidence against him, was stored outdoors and exposed to the elements, which resulted in the degradation of the "dirt rub" and other forensic evidence on the vehicle [*Id.*].[1]  Petitioner asserts that the only evidence available to the jury at his trial was then "one-sided, subjective evidence" presented by "state experts that were present on the scene of the accident and unilaterally determined what evidence to collect and document" [*Id.* at 41].  Petitioner contends that he suffered prejudice where the vehicle was not then appropriately subject to adversarial testing as defense experts had to rely on inadequate reports and photographs from state experts, rather than direct viewing of the evidence, which also served to undermine their testimony as compared to State experts [*Id.*].  Respondent argues that the evidence on Petitioner's vehicle was not exculpatory, but rather only "potentially useful," and that where Petitioner could not show that the State had a duty to preserve the evidence or acted in bad faith in failing to do so, that he should not be entitled to relief [Doc. 15 p. 29-38].  The Court agrees with Respondent, where Petitioner cannot show that the evidence on his vehicle was exculpatory nor that the State acted in bad faith in failing to preserve the evidence, he is not entitled to relief.

"Separate tests are applied to determine whether the government's failure to preserve evidence rises to the level of a due process violation in cases where material exculpatory evidence is not accessible versus cases where 'potentially useful' evidence is not accessible." *United States v. Wright*, 260 F.3d 568, 570-71 (6th Cir. 2001) (internal citations omitted).  When evidence "both possess[es] an exculpatory value that was apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means," the failure to preserve that evidence is a violation of due process

---

[1] In his reply brief, Petitioner also contends that the vehicle was towed before officers properly documented the body of the vehicle, including the location and size of the alleged dirt rub [Doc. 20 p. 15].

rights, regardless of whether the government acted in bad faith in destroying that evidence. *California v. Trombetta*, 467 U.S. 479, 489 (1984).

However, when the evidence is only potentially useful, or "of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant," the Court applies *Arizona v. Youngblood*. 488 U.S. 51, 57 (1988). There, the Supreme Court determined that the State does not have "an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." *Id.* at 58. Under this standard, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id.*

Petitioner raised this claim on direct appeal, arguing that the trial court erred in "failing to remediate" the State's failure to preserve the evidence [Doc. 14-18 p. 32-44]. There the TCCA applied the standard set out by the Tennessee Supreme Court in *State v. Ferguson*, 2 S.W.3d 912, 915-17 (Tenn. 1999), which was implemented to "expand the minimum level of protection" provided by the "bad faith standard" set out in *Youngblood*. *Cornwell I*, 2012 Tenn. Crim. App. LEXIS 868, at *38 (quoting *Burford v. State*, 845 S.W.2d 204, 207 (Tenn. 1992)). The TCCA found that while there was a "general duty to preserve all evidence to allow a criminal defendant the opportunity for discovery and inspection," under *Ferguson*, the court considered "whether a trial, conducted without the [lost or] destroyed evidence, would be fundamentally fair." *Id.* To determine fundamental fairness, the TCCA applied *Trombetta* and analyzed whether the evidence "possess[ed] an exculpatory value that was apparent before the evidence was destroyed" and was "of such a nature that the defendant would be unable to obtain comparable evidence by other

reasonably available means." *Id.* (quoting *State v. Coulter*, 67 S.W.3d 3, 54 (Tenn. Crim. App. Jun. 26, 2001)).

The TCCA found that the dirt rub on the car was inculpatory rather than exculpatory. *Id.* at 42. The court noted that Petitioner had not pled that exculpatory evidence would have been revealed through further examination, merely that he suffered prejudice because his experts did not get to observe the vehicle. *Id.* Ultimately, quoting *Trombetta* and *Youngblood*, the court found that "when 'the chances [were] extremely low that preserved samples would have been exculpatory,' the Due Process Clause of the Fourteenth Amendment does not require law enforcement agencies to preserve evidence for later use," and that "the possibility that… [evidence] could have exculpated… if preserved or tested [was] not enough to satisfy the standard of constitutional materiality." *Id.* (quoting *Trombetta*, 467 U.S. at 488-91; *Youngblood*, 488 U.S. at 56 n.1). The court went on to note that even if the evidence had been material, Petitioner was not entitled to relief under *Ferguson* because the evidence in question was available through other means at trial: namely, the testimony of various law enforcement officers and the presentation of photographs of Petitioner's vehicle,[2] and that it could not find that the State acted negligently, where officers carefully documented all evidentiary aspects of Petitioner's vehicle. Moreover, it noted there was sufficient other evidence to sustain Petitioner's conviction.[3] *Id.*

---

[2] The court held that while Petitioner challenged the adequacy of the photographs, the jury "as the trier of fact, reviewed the photographs and determined for itself whether dirt rub was visible in the photographs." *Cornwell I*, 2012 Tenn. Crim. App. LEXIS 868, at *44.

[3] This evidence included: "(1) testimony regarding motive; (2) DNA testing confirming the victim's blood on the undercarriage of the vehicle; (3) blood spatter evidence indicating directionality of the vehicle and the victim's body; (4) medical testimony regarding the identification of wound patterns and the mechanisms or parts of the vehicle that caused them; and (5) photographs of the front of the vehicle license plate holder where officers observed dirt rub evidence." *Id.* at *45.

30

The Court cannot find that the state court's holding was either contrary to or an unreasonable application of Supreme Court precedent, nor that it involved unreasonable factual findings. Even in the instant petition, Petitioner does not argue that the evidence on his vehicle was exculpatory or allege that examination would have shown a dirt rub on the rear of the car, but rather summarily states that the evidence is "material evidence within the bounds defined in *Trombetta*" [Doc. 1 p. 42].[4] Although Petitioner includes a discussion about the *type* of evidence, arguing that here the evidence is distinguished from that in *Trombetta* because it is "not based in science and could not be reviewed or replicated," he notably does not point to any established Supreme Court holdings that this Court's analysis should turn on the type of evidence rather than its exculpatory value.[5] *See Howes v. Fields*, 132 S. Ct. 1181, 1187 (2012) (holding that a state court decision is contrary to or an unreasonable application of clearly established Supreme Court precedent only when it contradicts the *holdings* of Supreme Court decisions, as opposed to dicta). Where Petitioner has offered nothing to indicate that the evidence present on his vehicle was exculpatory, and the Court has found none in the record, the Court cannot hold the state court's finding that the evidence was not exculpatory and did not trigger the standard in *Trombetta* to be contrary to or an unreasonable application of federal law.

---

[4] In *Trombetta*, the Court held that "[t]o meet this standard of constitutional materiality, see *United States v. Agurs*, 427 U.S. [97,] 109-110 [(1976)], evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Trombetta*, 467 U.S. at 489.

[5] Petitioner argues that *Trombetta* involved breathalyzer analysis where the device used "was subjected to rigorous monitoring," which then allowed the defendant to "challenge the accuracy and validity of test results without having the actual sample to retest" and that such regulation provided "comparable evidence… to challenge" [Doc. 1 p. 43]. Petitioner then argues that unlike the findings of the medical examiner which could be verified by experts based on the methods used, the photographs were not then comparable to the actual evidence [*Id.*].

31

Furthermore, while Petitioner takes issue with the manner and quality of the evidence presented at trial, the jury did in fact receive comparable evidence through photographs and testimony by law enforcement officers detailing the evidence on Petitioner's vehicle. The State also presented DNA and blood spatter analysis, as well as evidence from two officers who were present at the scene and a forensic pathologist, all of whom personally viewed the vehicle. These witnesses each testified that they saw dirt rub on the front of the vehicle but not the rear. The crux of Petitioner's argument is that the evidence collected by the State was favorable to the State, and thus ripe for bias, and that his defense was prejudiced because his experts had to rely on potentially-biased photographs and reports by law enforcement officers rather than directly inspecting the vehicle. At its core, this argument asks the Court to judge the credibility of the witnesses or assess the weight this evidence should be given, which is not appropriate in a habeas context. *See United States v. Marshall*, 248 F.3d 525, 536 (6th Cir. 2001). The State's ability to present comparable evidence suggests Petitioner is not entitled to relief under *Trombetta*.

While the evidence from the vehicle was an important part of Petitioner's case, the most that could be said was that it was "potentially useful" for Petitioner's defense; therefore, Petitioner has not shown that the State had a duty to preserve it. *See Wright*, 260 F.3d at 571. Petitioner must then prove "bad faith" in order to establish a due process violation. *Youngblood*, 488 U.S. at 57. While the TCCA did not expressly determine whether the State acted in bad faith, it did hold that Petitioner was not entitled to relief under Tennessee's less onerous standard and that law enforcement officers were not negligent in their handling of the evidence where they extensively documented and photographed the vehicle and the evidence on it. *Cornwell I*, 2012 Tenn. Crim. App. LEXIS 868, at *43. Based on the trial record, which demonstrates that officers testified regarding their various collection efforts, including photographs, DNA swabs, and documentation

of the vehicle, the state court's finding that the officers were not negligent was not an objectively unreasonable determination. Where the State was not negligent, it cannot be said to have acted in bad faith. *See Macfarlane v. Westbrooks*, No. 3:13-cv-828, 2013 U.S. Dist. LEXIS 165050, *39 (M.D. Tenn. Nov. 20, 2013) (holding that where the state court was not unreasonable in determining that officers were not negligent under Tennessee's more protective standard, the Court could not find that the State acted in bad faith). Absent a demonstration of constitutional materiality or of bad faith, Petitioner is not entitled to habeas relief on this claim.

### B. Ineffective Assistance of Counsel

Petitioner next claims that he received the ineffective assistance of counsel. Specifically, he claims that counsel failed to "investigate" the evidence on his vehicle in a timely manner and failed to effectively investigate and challenge the testimony of the State's forensic pathologist, Dr. Mileusnic-Polchan [Doc. 1 p. 6-14, 24-25]. Petitioner also argues that the state court erred in considering his claims of ineffective assistance of counsel "in isolation" [Doc. 1 p. 30-36].

To successfully prove that counsel was constitutionally ineffective, a defendant must establish: (1) that counsel's performance was deficient such that he was no longer "functioning as the 'counsel' guaranteed under the Sixth Amendment," and (2) that counsel's "performance prejudiced the defense . . . so as to deprive the defendant of a fair trial" and undermine the reliability of trial results. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To prove deficiency, the defendant must show "that counsel's representation fell below an objective standard of reasonableness," and was "outside the wide range of professionally competent assistance." *Id.* at 688. Counsel's performance is given broad deference and is not deficient where it simply "deviate[s] from best practices of most common custom," but rather, only where it amounts to incompetence. *Harrington v. Richter*, 562 U.S. 86, 104-05 (2011). To prove prejudice,

the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In other words, counsel's errors were sufficient to undermine confidence in the outcome and petitioner has been deprived of a fair trial. *Id.* at 687. Where a court fails to find one element, it need not consider the other. *Id.* at 697.

The Supreme Court has clarified that when a federal court reviews a state court's application of *Strickland*, which sets its own high bar for claims, "establishing that a state court's application was unreasonable under §2254(d) is all the more difficult." *Richter*, 562 U.S. at 105 (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)). "In those circumstances, the question before the habeas court is 'whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.'" *Id.*; *see Jackson v. Houk*, 687 F.3d 723, 740–41 (6th Cir. 2012) (stating the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA").

### i. Failed to investigate forensic evidence

Mirroring his previous claim, Petitioner claims that his trial counsel was ineffective for failing to investigate the evidence on his vehicle before it had degraded and for failing to ask the State to preserve this evidence [Doc. 1, p. 6-8, 24-25]. Petitioner argues that he was prejudiced by counsel's failures because the resulting degradation of the evidence prevented defense experts from being able to base their conclusions on the physical evidence or effectively rebut the state's experts [*Id.*]. Respondent argues that because the court concluded that there was no exculpatory evidence on the vehicle which the State had a duty to preserve, it was not then unreasonable for the court to conclude that Petitioner had failed to establish prejudice based on counsel's failure to request that the State preserve the vehicle [Doc. 15 p. 36]. Respondent also argues that Petitioner

was not prejudiced by this alleged failure because trial counsel did ultimately present testimony which contradicted the State's proof and corroborated Petitioner's version of the incident [*Id.*]. The Court agrees that the state court's holding was not objectively unreasonable and Petitioner is not entitled to relief on this claim.

Petitioner raised this claim in his state post-conviction petition and subsequent appeal to the TCCA, where he challenged both that counsel was ineffective for failing to timely inspect his vehicle and for failing to request remedies other than the dismissal of the indictment related to the failure to preserve the evidence [Doc. 14-33 p. 24-27, 63-73]. At post-conviction hearings, Petitioner's counsel testified that he waited to inspect Petitioner's vehicle until he had obtained the requisite funding to hire an accident reconstruction expert and had an expert who could "explain it to [him]" [Doc. 14-29 p. 35]. Counsel testified that when he and the retained expert, Mr. Parham, inspected the vehicle, Mr. Parham indicated that the weather had degraded the evidence such that he could no longer determine whether the vehicle had been moving forward or backward [*Id.* at 36]. Counsel testified that he filed a *Ferguson* motion in response to the degradation of the evidence, but only asked for dismissal of the indictment because he was having difficulty getting the motion heard and had a sense that Judge Baumgartner had "prejudged" the issue [*Id.* at 38-39]. Counsel testified that it was not a strategic decision to ask only for dismissal [*Id.* at 38].

On appeal, the TCCA applied *Strickland* and found that Petitioner could not establish that he was prejudiced by lead counsel's failure to timely inspect the vehicle. *Cornwell II*, 2017 Tenn. Crim. App. LEXIS 994 at *64. The TCCA found that as there was no exculpatory evidence to be preserved, Petitioner was not prejudiced by counsel's failure to timely inspect the vehicle or request multiple *Ferguson* remedies. *Id.* Moreover, the court found that contrary to counsel's testimony, the defense's expert, Mr. Parham, did rebut the testimony of the State's experts,

35

testifying that he "did not believe that 'the photograph of the front license plate. . . [was] conclusive of dirt rub,'" opined "'that the physical evidence was consistent with [the Petitioner's] explanation of the incident'" and disagreed with "the State's experts that the car was traveling in a 'unilateral' direction." *Id.*

The Court cannot find that the state court's rejection of this claim was unreasonable. It was not objectively unreasonable to hold that Petitioner was not prejudiced by the timing of counsel's inspection of his vehicle or his failure to ask the State to preserve the evidence on it when such evidence was not exculpatory, and the State had no duty to preserve it. *See White v. Hooks*, No. 3:17-cv-111, 2017 U.S. Dist. LEXIS 186863, at *23-24 (S. D. Ohio Nov. 13, 2017) (holding that counsel's failure to file a motion to dismiss based on the failure to preserve potentially exculpatory evidence was not ineffective assistance where the evidence was not "materially exculpatory" and there was no evidence that the evidence was destroyed in bad faith); *Henderson v. MacLaren*, No. 3:16-cv-13223, 2019 U.S. Dist. LEXIS 113373, at *15-16 (E.D. Mich. July 9, 2019) (holding that Petitioner's claim that counsel was ineffective in failing to raise a claim challenging the failure to preserve the evidence was meritless where the evidence in question was not material and the police had not acted in bad faith).

Any potential for prejudice was further mitigated where counsel was able to present the testimony of Mr. Parham who both supported Petitioner's version of events and rebutted the testimony of the State's witnesses. Mr. Parham disagreed with Officer Steele's testimony that the vehicle pushed the victim to the ground, indicating rather that she was lying on the ground before she was hit [Doc. 14-12, p. 35-36]. He challenged the quality of the photographs, the procedures followed in taking them, and testified extensively that they did not show evidence of a dirt rub on the front of the vehicle, nor were they of sufficient quality that they could be used to independently

36

identify and analyze any alleged dirt rub [*Id.* at 37-42]. He likewise disagreed with the State's proposition that the vehicle was moving in only one direction [*Id.* at 44]. Finally, he also disagreed that being exposed to the elements would not have impacted the evidence present on the vehicle [*Id.* at 46]. Overall, this expert testified that none of the evidence he had reviewed was inconsistent with Petitioner's version of events [*Id.* at 55, 61].

Despite Petitioner's contention, and even given counsel's inability to analyze some of the physical evidence, counsel presented testimony which undermined the State's theory of the case and the credibility of its evidence. The jury's apparent lack of credit to that evidence will not render counsel ineffective. The state court's holding was neither contrary to nor an unreasonable application of Supreme Court precedent and Petitioner is not entitled to relief.

### ii. Failed to challenge state forensic pathologist

Petitioner next argues that trial counsel was ineffective in his handling of the testimony of Dr. Mileusnic-Polchan, the State's forensic pathologist, whose report and testimony indicated that the victim was dragged underneath Petitioner's vehicle for a short distance while it was moving forward and that the manner of death was homicide [Doc. 1, p. 8-12]. Petitioner ultimately takes a host of issues with Dr. Mileusnic-Polchan's testimony, which he alleges exceeded the scope of both her report and her expertise, and counsel's preparation for and handling of this testimony which he characterizes as counsel's failure to "effectively investigate or challenge [her] conclusions" [*Id.*].

After receiving her report, lead counsel, along with co-counsel and other members of the defense team, met with Dr. Mileusnic-Polchan. *Cornwell II*, 2017 Tenn. Crim. App. LEXIS 994, at *22. During this meeting, co-counsel believed that the manner in which Dr. Mileusnic-Polchan described one injury to the victim's abdomen undermined the State's theory that the vehicle was

37

moving forward and supported Petitioner's version of events. *Id.* at *22-23. When questioned about this belief, Dr. Mileusnic-Polchan indicated that she would reserve judgment until she viewed the vehicle again. *Id.* at *23-24. Petitioner alleges that counsel was deficient when he failed to follow-up with Dr. Mileusnic-Polchan to view the vehicle or further investigate this issue [Doc. 1, p. 8-12]. At post-conviction hearings, counsel conceded that he did not follow-up with Dr. Mileusnic-Polchan but testified that he had no intention of doing so because he and co-counsel firmly believed that her statements during the interview confirmed Petitioner's version of the incident. *Id.* at *24-27.

After that meeting and approximately one week before trial, counsel filed a motion for a *McDaniel*[6] hearing on Dr. Mileusnic-Polchan's qualifications. *Id.* at *27. Petitioner takes issue with both the timing of this motion and counsel's handling of it, claiming that counsel "failed to file appropriate pretrial motions at the appropriate time and with the necessary supporting paperwork" [Doc. 1, p. 8-12]. At post-conviction hearings, counsel noted that he intended to use this hearing as a discovery device because Dr. Mileusnic-Polchan had not been forthcoming in their prior meeting. *Id.* Counsel admitted that while he had hired an expert who had provided him with a report, he did not attach that report to his motion for a pre-trial *McDaniel* hearing, because he "didn't think to do it."[7] *Id.* Petitioner claims that along with the absence of the report, counsel did not otherwise effectively illustrate why a pre-trial hearing was necessary [*Id.*].

The trial court did not grant a *pre-trial* hearing but did hold a jury-out hearing the afternoon before Dr. Mileusnic-Polchan's testimony. *Id.* at *28, 30. Petitioner claims that counsel was

---

[6] *McDaniel* refers to Tennessee's standard for the admissibility of expert testimony, *McDaniel v. CSX Transportation, Inc.*, 955 S.W.2d 257 (Tenn. 1997).

[7] Petitioner also contends that this report did not address Dr. Mileusnic-Polchan's methods or whether she "appropriately applied foundational science."

ineffective at this jury-out hearing when he failed to effectively question Dr. Mileusnic-Polchan about whether her conclusions were supported by the underlying science of forensic pathology [*Id.*]. Although not explicitly stated, it appears Petitioner is beleaguered by the conclusiveness with which Dr. Mileusnic-Polchan stated her opinions, as she testified specifically as to the cause of the injuries rather than that the injuries were "consistent with," as his expert indicated was appropriate practice. Petitioner also claims that counsel did not effectively question Dr. Davis, the defense's retained expert, about whether Dr. Mileusnic-Polchan's testimony was scientifically reliable [*Id.*]. Petitioner further alleges that counsel's failure to meet and confer with his retained expert after this hearing to prepare for Dr. Mileusnic-Polchan's testimony was likewise ineffective [*Id.*].

The morning after the trial court held the jury out hearing on her testimony, Dr. Mileusnic-Polchan testified and, according to Petitioner, further expanded her testimony beyond her expertise [*Id.*]. Petitioner takes specific issue with Dr. Mileusnic-Polchan's testimony: (1) that the incident was a homicide and there was "intent;" (2) that the victim was not affected by the residual impacts of marijuana; and (3) regarding the dirt rub, location of the body, and blood spatter analysis [*Id.*]. Petitioner claims that counsel both failed to object to Dr. Mileusnic-Polchan's testimony when she offered new, unfounded conclusions and failed to effectively cross-examine her [*Id.*].

Petitioner also challenges a line of questioning counsel used to impeach Dr. Mileusnic-Polchan by raising her previous statement which counsel believed at the time to support Petitioner's version of events [*Id.*]. Specifically, Plaintiff argues that as Dr. Mileusnic-Polchan quickly and firmly rebutted counsel's characterization of her prior statements, this line of questioning highlighted counsel's lack of preparation and undermined counsel's credibility to the jury [*Id.*]. He also argues counsel was unable to rehabilitate himself because he had not

memorialized his meeting with Dr. Mileusnic-Polchan in any meaningful way [*Id.*]. Petitioner next takes issue with counsel's decision not to call any of the available witnesses, namely the defense team who had attended the meeting with Dr. Mileusnic-Polchan, to contradict her testimony [*Id.*]. Moreover, Petitioner claims that this line of questioning rendered counsel ineffective where counsel had promised during opening arguments to elicit testimony from Dr. Mileusnic-Polchan that it was her opinion that the vehicle was moving backwards, which he clearly did not elicit [*Id.*].

Lastly, Petitioner claims that counsel did not effectively use the defense's retained expert to contradict Dr. Mileusnic-Polchan's conclusions [*Id.*]. He claims that counsel was ineffective where: (1) Dr. Davis testified that he could not offer an opinion on whether the incident was a homicide; (2) counsel did not question Dr. Davis about the residual effects of marijuana; and (3) counsel did not elicit testimony from Dr. Davis that definitive conclusions, such as those offered by Dr. Mileusnic-Polchan were not scientifically reliable [*Id.*].

Petitioner claims that all of counsel's above-described errors prejudiced Petitioner's defense because ultimately, Dr. Mileusnic-Polchan's testimony was not subject to appropriate adversarial testing [*Id.*]. He alleges that the jury heard Dr. Mileusnic-Polchan testify conclusively to opinions she was not qualified to make – including that the cause of death was homicide and that Petitioner intentionally ran over his wife – and the defense failed to either undermine her as a witness or present sufficient proof to counter her opinions [*Id.*].

In response to this weighty list of accusations, Respondent contends that the TCCA correctly applied *Strickland* to find that trial counsel was not deficient in his preparation for or handling of Dr. Mileusnic-Polchan's testimony [Doc. 15 p. 38]. The Court agrees with

Respondent. Given the double layer of deference granted to both counsel's performance and state court holdings reviewing that performance, the Court cannot find that Petitioner is entitled to relief.

Petitioner first challenged Dr. Mileusnic-Polchan's testimony on direct appeal, where he argued that the trial court erred in allowing the State to elicit testimony which had been previously withheld from defense counsel and which exceeded the scope of Dr. Mileusnic-Polchan's expertise, and that Dr. Mileusnic-Polchan was biased in favor of the State [Doc. 14-18, p. 3, 44-54]. There, the TCCA found that Dr. Mileusnic-Polchan's testimony about the manner or infliction of the victim's wounds, the interaction between the automobile and the victim's body, and the manner of death as homicide, were all proper subjects about which she could offer testimony as a medical examiner. *Cornwell I*, 2012 Tenn. Crim. App. LEXIS 868, at *50. Later, in his post-conviction proceedings, Petitioner raised a claim of ineffective assistance of counsel related to Dr. Mileusnic-Polchan's testimony, arguing that "due to trial counsel's deficiencies as well as the trial judge's failure to effectively manage the case, that the defense was ambushed with and failed to effectively counter critical forensic pathology testimony at trial" [Doc. 14-33, p. 75-79].

At post-conviction hearings, Dr. Davis, the defense's retained expert, testified that Dr. Mileusnic-Polchan exceeded the scope of her expertise and that her conclusions were not reliable [Doc. 14-28 p. 133-135]. He further testified that he was prevented from effectively testifying or preparing counsel because of the lack of information provided before trial [*Id.* at 149-151]. Lead counsel testified as well, admitting that he made mistakes, such as failing to attach the report to his *McDaniel* motion, and struggled to keep up with and properly respond to Dr. Mileusnic-Polchan's testimony [Doc. 14-29, p. 108-109]. Counsel characterized his own representation as "overall" ineffective, particularly noting his performance with regard to Dr. Mileusnic-Polchan [*Id.*]. Despite counsel's opinion, the post-conviction court denied Petitioner relief on this claim.

41

On post-conviction appeal, TCCA applied *Strickland* and held that counsel was not deficient in his preparation for Dr. Mileusnic-Polchan's trial testimony and that Petitioner was not prejudiced by counsel's handling of this testimony. *Cornwell II*, 2017 Tenn. Crim. App. LEXIS 994, at *65-72.

> At the outset, we conclude that lead counsel was not deficient in his preparation for Dr. Mileusnic-Polchan's trial testimony. Lead counsel hired a consulting expert, Dr. Pedigo, to review the autopsy report. Lead counsel then had a meeting with Dr. Mileusnic-Polchan to review her autopsy report. Co-counsel, Dr. Pedigo, and a member of lead counsel's staff, Mr. Davis, also attended the meeting. As a result of the meeting, lead counsel requested a continuance in order to retain an expert in forensic pathology, Dr. Davis, because he had learned that Dr. Mileusnic-Polchan would opine that all of the victim's injuries were "unidirectional" and that her testimony would be consistent with the State's theory of the case.

> Much of the Petitioner's complaints about lead counsel's preparation for Dr. Mileusnic-Polchan's trial testimony are based on lead counsel's handling of his request for a McDaniel hearing. Lead counsel admitted at the post-conviction hearing that he did not request the McDaniel hearing to challenge Dr. Mileusnic-Polchan's qualifications as an expert in forensic pathology. Rather, lead counsel requested a McDaniel hearing as a discovery device to learn what Dr. Mileusnic-Polchan's trial testimony would be and "whether there [was] science to support [her] opinion[s]." Lead counsel explained that he needed to use the McDaniel hearing as a discovery device because Dr. Mileusnic-Polchan was "very careful" when interviewed "not to volunteer anything." Lead counsel also testified that he was aware that Dr. Mileusnic-Polchan had classified the victim's death as a homicide and of her opinion that the victim's injuries were "unidirectional."

> …

> [W]e conclude that the Petitioner failed to establish that he was prejudiced by lead counsel's handling of the McDaniel hearing request. Lead counsel did not attach a "countervailing expert opinion" to his motion. However, the trial court eventually granted his motion for a McDaniel hearing at which both Dr. Mileusnic-Polchan and Dr. Davis testified. While pretrial McDaniel hearings are preferable, it is not erroneous for a trial court to conduct a McDaniel hearing during a trial. See Scott, 275 S.W.3d at 404 (noting that the abuse of discretion standard of review for a trial court's admission or exclusion of expert testimony "applies regardless of whether the ruling was made during [pretrial] proceedings or during the trial itself"). Contrary to lead counsel's recollection at the post-conviction hearing, he had time after the McDaniel hearing to prepare for Dr. Mileusnic-Polchan's trial testimony and consult with Dr. Davis.

42

More importantly, this court held on direct appeal that Dr. Mileusnic-Polchan's testimony about the direction the Petitioner's car was traveling when it struck the victim, and specifically her testimony about the injuries left by the car's heat shield, was not "outside her area of expertise." Cornwell, 2012 Tenn. Crim. App. LEXIS 868, 2012 WL 5304149, at *18. Rather, her testimony was "a proper subject upon which a medical examiner may offer testimony" because it dealt with "the interaction between the automobile and the victim's body." Id. This court also held that there was "no error in [Dr. Mileusnic-Polchan's] opinion that the manner of death was homicide." Id. Furthermore, Dr. Davis testified at trial about his major areas of disagreement with Dr. Mileusnic-Polchan's opinions. As such, the Petitioner was not prejudiced by lead counsel's handling of the McDaniel hearing because a foundation existed for Dr. Mileusnic-Polchan's testimony, and it was thoroughly tested by the adversarial process.

With respect to Dr. Mileusnic-Polchan's testimony to the jury, we note that "the method by which a witness is examined is a 'strategic and tactical decision of trial counsel which is not to be measured by hindsight.'" William A. Osborne v. State, No. M2014-00458-CCA-R3-PC, 2015 Tenn. Crim. App. LEXIS 128, 2015 WL 832288, at *10 (Tenn. Crim. App. Feb. 26, 2015) (quoting State v. Kerley, 820 S.W.2d 753, 756 (Tenn. Crim. App. 1991)). "[C]ounsel must make quick and difficult decisions respecting strategy and tactics which appear proper at the time but which, later, may appear to others, or even to the trial lawyer himself, to have been ill[-]considered." Hellard v. State, 629 S.W.2d 4, 9-10 (Tenn. 1982). While lead counsel's "decisions throughout [Dr. Mileusnic-Polchan's] testimony may have been ill-advised," we cannot say that "a failed witness examination strategy . . . rises to the level of incompetent representation." Osborne, 2015 Tenn. Crim. App. LEXIS 128, 2015 WL 832288, at *10.

With respect to his objections, lead counsel testified at the post-conviction hearing that he was hesitant to object during Dr. Mileusnic-Polchan's testimony because she testified "immediately" after the McDaniel hearing and because he did not have the opportunity to process what he heard at the hearing or consult with Dr. Davis about it. However, as we noted above, the trial record belies lead counsel's recollection of Dr. Mileusnic-Polchan's testimony. Rather than, as the Petitioner argues on appeal, lead counsel being "unprepared and ill[-]equipped to process" what he learned at the McDaniel hearing, the record established that lead counsel was aware of Dr. Mileusnic-Polchan's opinions regarding the manner of death and direction of travel of the Petitioner's car, that he had extensively prepared for Dr. Mileusnic-Polchan's testimony, and that he had the benefit of a McDaniel hearing the day before Dr. Mileusnic-Polchan testified to the jury.

With respect to lead counsel's attempt to impeach Dr. Mileusnic-Polchan with her statements from their pretrial meeting, co-counsel testified that the defense team "agonized over how to use [that] information" and was aware that they "might suffer" by questioning Dr. Mileusnic-Polchan about the pretrial meeting. However, both lead and co-counsel believed that Dr. Mileusnic-Polchan's statements about

43

the heat shield at their pretrial meeting confirmed the Petitioner's version of events. As such, lead counsel told the jury in his opening statement about the pretrial meeting, about what Dr. Mileusnic-Polchan had said regarding the heat shield, about co-counsel's confronting Dr. Mileusnic-Polchan with the orientation of the slats on the heat shield, and about Dr. Mileusnic-Polchan's leaving the meeting saying that she was unsure about the orientation of the slats and that she would have to check the car to confirm the orientation.

The Petitioner contends that by raising the pretrial meeting, lead counsel improperly put his credibility at issue. However, the case cited by the Petitioner to support this argument, <u>State v. Zimmerman</u>, dealt with a claim of ineffective assistance of counsel when trial counsel promised to present evidence during his opening statement but failed to do so during the course of the trial. 823 S.W.2d 220, 225 (Tenn. Crim. App. 1991). That is not the case here. Lead counsel confronted Dr. Mileusnic-Polchan about her statements at the pretrial meeting during his cross-examination, and Dr. Mileusnic-Polchan admitted that at the time of the pretrial meeting she was unsure of the orientation of the slats and that she needed to physically inspect the car to be sure.

In hindsight, it is clear that this attempt to impeach Dr. Mileusnic-Polchan was ill-advised given that lead counsel mistakenly stated that Dr. Mileusnic-Polchan said the car backed over the victim and Dr. Mileusnic-Polchan's strong reaction to that. However, we cannot say that adopting this strategy was deficient because lead and co-counsel believed that Dr. Mileusnic-Polchan had confirmed the Petitioner's version of the incident and had weighed the possible benefits of impeaching Dr. Mileusnic-Polchan with a prior statement that confirmed the Petitioner's story against the possible risks.

With respect to lead counsel's failure to call any witnesses to impeach Dr. Mileusnic-Polchan's testimony about the pretrial meeting, we note that lead counsel had strategic reasons for not calling each of the possible witnesses. Lead counsel felt that he could not call Dr. Pedigo due to Dr. Pedigo's prior criminal convictions. Lead counsel felt that it would not be "fair" to call Mr. Davis because Mr. Davis was a relatively new employee at lead counsel's office. Lead counsel seriously considered calling co-counsel to testify and met with the prosecutor and Judge Baumgartner to discuss the ethical concerns of doing so. However, after considering the issue and Judge Baumgartner's advice, lead counsel decided not to call co-counsel as a witness for fear of how the jury would react and of making "a bad situation worse." Given that lead counsel had strategic reasons for not calling each of the potential witnesses, we conclude that his performance was not deficient in this regard. Accordingly, we affirm the post-conviction court's findings that lead counsel was not deficient in his handling of Dr. Mileusnic-Polchan's trial testimony.

*Id.* at *65-73.

44

The state court's holding that counsel was not constitutionally ineffective creates a dual layer of deference which Petitioner must overcome to be entitled to relief. *Kelly v. Lazaroff*, 846 F.3d 819, 831-32 (6th Cir. 2017). The state court's holding is entitled to deference and counsel's performance is presumed to be constitutionally adequate. *Id.* To show that counsel was ineffective, his errors must have been well and truly outside the grounds of reasonable conduct and competent assistance, not just mere deviations from best practice. Here, Petitioner has not offered enough to overcome this deference.

Counsel used multiple avenues to understand and prepare for Dr. Mileusnic-Polchan's testimony – obtaining and reviewing Dr. Mileusnic-Polchan's autopsy report, hiring two separate experts to review that report, meeting with Dr. Mileusnic-Polchan herself to go over the report, filing a motion aimed at further discovering the prospective contents of her testimony, and hiring an expert to counter her testimony at trial. Although a *pretrial* hearing was not granted, counsel was able to cross-examine Dr. Mileusnic-Polchan at a jury-out *McDaniel* hearing before her testimony. Counsel also testified that he was "sure" he met with the defense team to further prepare for her testimony after this hearing. In analyzing counsel's performance the Court must avoid the distorting effects of hindsight. *Strickland*, 466 U.S. at 690; *Cobb v. Perini*, 832 F.2d 342, 347 (6th Cir. 1987). While the record does at least minimally support Petitioner's contention that Dr. Mileusnic-Polchan's testimony was more than counsel bargained for, this does not *per se* indicate that counsel's *preparation* was deficient. The question before the Court is not whether there was more that counsel could have possibly done, but rather whether counsel's preparation was within the bounds of professionally competent assistance. Here, where the record supports that counsel prepared extensively, the Court cannot hold that the state court was unreasonable in finding that

45

counsel was not deficient in his preparation for and investigation into Dr. Mileusnic-Polchan's testimony.

Nor was the state court's holding that counsel was not ineffective in his handling of Dr. Mileusnic-Polchan's testimony at trial unreasonable. While Petitioner challenges counsel's failure to object to Dr. Mileusnic-Polchan's testimony, the TCCA found that Dr. Mileusnic-Polchan's testimony was properly within her expertise and that there was a foundation for her testimony. Counsel is not deficient for failing to lodge an objection to testimony which was found to be proper. *See e.g.*, *Cobb*, 832 F.2d at 347-48 (rejecting an ineffective assistance of counsel claim based on counsel's failure to object where it was unclear whether the challenged evidence was improper).

With regards to counsel's attempt to impeach Dr. Mileusnic-Polchan with his interpretation of her previous statements, the Court does not find that counsel's conduct was outside of the bounds of professionally competent assistance. Counsel made a calculated decision that the risk inherent in his approach was outweighed by the benefit of introducing Dr. Mileusnic-Polchan's prior statement. While this approach may not have had its intended effect, it was not unreasonable for counsel to use the limited information he believed he had at his disposal to challenge testimony which was particularly damning to Petitioner's defense. *See Strickland*, 466 U.S. at 690 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."); *Sowell v. Collins*, 557 F.Supp. 2d 843, 886 (S.D. Ohio 2008) ("Strategic choices of counsel are entitled to deference, and the cross-examination of witnesses falls within the area of tactics or strategy that ought not be subjected to second-guessing merely because that particular strategy proved to be unsuccessful.").

By the same reasoning, the Court does not find the state court unreasonable for holding that counsel was not ineffective for failing to call witnesses to impeach Dr. Mileusnic-Polchan

where counsel had strategic reasons for doing so. To demonstrate that counsel was ineffective for failing to call witnesses, Petitioner must establish that the witnesses had favorable information and the lack of that witness's testimony prejudiced his defense. *Pillette v. Berghuis*, 408 F. App'x 873, 884 (6th Cir. 2010) (citing *Towns v. Smith*, 395 F.3d 251, 258-60 (6th Cir. 2005)). While these witnesses could have supported counsel's understanding of Dr. Mileusnic-Polchan's former statements, neither of them could have contradicted her current testimony that it was her opinion, after viewing the vehicle, that the victim's abdominal injury was consistent with the vehicle unilaterally moving forward. Moreover, either of the three available witnesses bore potential risk for Petitioner's defense or were subject to impeachment which could have further undermined their testimony. The state court's holding is not unreasonable where it is not clear that these witnesses could indeed testify to information favorable to Petitioner's defense or that his defense was prejudiced by the lack of their testimony. *See e.g. Jackson v. Bradshaw*, No. 2:03-cv-983, 2015 U.S. Dist. LEXIS 130273, at *25-26 (S.D. Ohio Sept. 28, 2015).

Turning now to Petitioner's claim that counsel was ineffective for his unfulfilled promise regarding this testimony to the jury, the Court first notes that Petitioner is correct that unfulfilled promises to the jury may render counsel ineffective. *Plummer v. Jackson*, 491 F. App'x 671, 678-80 (6th Cir. 2012) (citing *English v. Romanowski*, 602 F.3d 714, 728 (6th Cir. 2010)) (holding "it is unreasonable for counsel to promise testimony to the jury without first examining the availability and soundness of such testimony where counsel could, and should, have discovered these details prior to trial"). Such an unfulfilled promise can create a negative inference in the mind of the jury, which may wonder why the promised testimony was not proffered. *See English*, 602 F.3d at 729. However, *English* makes clear that the ineffective assistance of counsel is formed by the lack of a reasonably investigated basis for the promise, not simply the unfulfilled promise itself. *Id.* While

counsel generally has a duty to make reasonable investigation, *Strickland* clarifies that counsel may also reasonably determine that certain investigations are unnecessary. *Strickland*, 466 U.S. at 668, n. 19.

In this case, it was reasonable for counsel to rely on Dr. Mileusnic-Polchan's former statement to inform his expectations of her testimony at trial and his opening argument. As previously noted, the Court finds that counsel took extensive steps to investigate and prepare for Dr. Mileusnic-Polchan's testimony and through these steps reasonably believed he had procured the testimony he "promised" in opening. Although his expectation of her testimony did not come to fruition, counsel did have a reasonably-investigated basis for the promise. It was likewise reasonable for counsel to conclude that further meetings with Dr. Mileusnic-Polchan were unnecessary, especially when Dr. Mileusnic-Polchan was less than forthcoming in her disclosures with the defense team.

Even if Petitioner could prove deficiency, he cannot show prejudice here that would entitle him to relief. Despite Petitioner's contention, counsel was able to clarify his disagreement with Dr. Mileusnic-Polchan before the jury. During cross-examination, although Dr. Mileusnic-Polchan originally disagreed with counsel's characterization of her previous statements as supporting Petitioner's contention that he backed over the victim, she did agree that at the time of their previous interview, she had been unsure of the direction the car would have had to be moving to cause the injury in question [Doc. 14-11, p. 22-24]. This explanation minimized the sort of risk discussed in *English*, and the Court cannot find that this unfulfilled, but explained, promise was such that it was likely to undermine the reliability of the results of his trial.

In a case which relied primarily on forensic evidence to establish that the victim was intentionally, rather than accidentally, killed, testimony from a State's medical examiner that the

injuries indicated intent and were caused by homicide was likely to be extremely damaging to Petitioner's case and difficult for counsel to navigate. Although Petitioner challenges essentially every facet of counsel's handling of this testimony, the Court finds that counsel extensively prepared and effectively used cross-examination and his defense witnesses to challenge Dr. Mileusnic-Polchan's testimony. Petitioner is guaranteed competent, not perfect, representation and given the dual layer of deference due, the Court cannot find that the state court was unreasonable in determining that counsel was not constitutionally deficient.

### iii. Cumulative error

Petitioner argues that the TCCA erred when it considered each of trial counsel's alleged errors in isolation [Doc. 1 p. 30-36]. In his petition, Petitioner cites to a variety of case law highlighting counsel's duty to make reasonable investigations and outlining the methods through which counsel may do so with regards to forensic evidence. He notes the Court held in *Hinton v. Alabama*, 571 U.S. 263, 273 (2014) that in some cases the only reasonable defense strategy will require "consultation with experts or introduction of expert testimony." [*Id.*]. He then cites to *Strickland*, 466 U.S. at 695-96, to support his contention that the "effect of counsel's ineffectiveness must be determined in light of the totality of the circumstances." [*Id.*].[8] Petitioner then makes a logical leap that because the TCCA discussed his claims of ineffective assistance of counsel under "a different subheading and limit[ed] its analysis of the effect of each claim in a

---

[8] The passage Petitioner is seemingly pointing to provides that "[i]n making this [prejudice] determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695-96. The Court then goes on to note that counsel's errors may have varying levels of impact on "factual findings" and the inferences to be drawn. *Id.*

49

vacuum,"[9] that the court's holding is in violation of both *Strickland* and *Hinton* [*Id.*].  This Court

interprets Petitioner's claim to be one that Petitioner was prejudiced by the cumulative effect of

counsel's errors.  While the state court does not appear to have addressed the cumulative impact

of counsel's errors, and Respondent concludes that this issue is procedurally defaulted, it does

appear that Petitioner included language in his post-conviction appellate brief claiming the

cumulative effect of counsel's errors deprived Petitioner of the effective assistance of counsel

[Doc. 14-33, p. 42].  However, regardless of procedural default, the Court finds that Petitioner is

not entitled to relief on this claim.  *See Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) (holding

that federal courts are not required to address procedural default before denying a claim on its

merits).

The Court first notes that to the extent Petitioner is attempting to raise a stand-alone claim

of cumulative error, such would not be cognizable on habeas relief.  *Lorraine v. Coyle*, 291 F.3d

416, 447 (6th Cir. 2002) (holding that a procedurally defaulted cumulative error claim is not

cognizable in habeas actions); *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005) (holding "not

even constitutional errors that would not individually support habeas relief can be cumulated to

support habeas relief").  However, some courts have held that errors, including ineffective

assistance of counsel claims, that may not warrant relief independently may result in an unfair trial

when considered cumulatively.  *See, e.g.*, *Spears v. Mullin*, 343 F.3d 1215, 1251 (10th Cir. 2003);

*Harris By and Through Ramseyer v. Wood*, 64 F.3d 1432, 1438 (9th Cir. 1995).  However, the

Sixth Circuit is not included in those jurisdictions.  The Court respectfully disagrees with

Petitioner's contention that *Strickland's* "totality of the circumstances" standard requires that

---

[9] As Respondent notes, Petitioner likewise raises his claims each separately under its own
subheading with separate discussions of deficiency and prejudice [Doc. 14-33].

errors be cumulated or analyzed in conjunction, finding instead that this standard was set out to aid Courts in making the "prejudice" determination required of each ineffective assistance claim. Accordingly, it was not an unreasonable application of federal law for the state court to consider each of Petitioner's claims of ineffective assistance of counsel in its own right.

Even if the Sixth Circuit had specifically held that errors could be cumulated, Petitioner would not be entitled to relief. The Court has previously determined that errors that would not individually support relief may not be cumulated for relief. *See Scott v. Elo*, 302 F.3d 598, 607 (6th Cir. 2002); *Keith v. Mitchell*, 455 F.3d 662, 679 (6th Cir. 2006) (holding that "because the individual claims are all essentially meritless, [Petitioner] cannot show that the cumulative error[s] violated his constitutional rights"); *see also Stojetz v. Ishee*, No. 2:04-cv-263, 2014 U.S. Dist. LEXIS 137501, at *179-80 (S.D. Ohio Sept. 24, 2014) (noting that "because the sum of various zeroes remains zero," the combined effect of counsel's alleged errors does not warrant relief). Where Petitioner has not proven any individual error, or prejudice resulting from that error, there is no effect to be cumulated and Petitioner is not entitled to relief.

### C. Judicial Bias

Petitioner next claims that he received an unfair trial because the trial judge's misconduct, specifically an active drug addiction and related corruption, created an unconstitutional risk of bias and constituted structural error [Doc. 1 p. 45-53]. Petitioner, relying on *Rippo v. Baker*, 137 S. Ct. 905 (2017), seems to allege that the state court unreasonably applied federal law by holding that Petitioner must show that the judge in his case was actually biased, and erred in finding that Judge Baumgartner's misconduct did not create at least the appearance of unconstitutional bias [*Id.*]. Respondent concedes that Judge Baumgartner engaged in deplorable misconduct but contends because his misconduct was outside the courtroom and Petitioner had not proven that it had an

actual impact on the events of his trial, Petitioner should not be entitled to relief [Doc. 15 p. 46-57]. The Court finds that the state court's holding is entitled to deference, and that although the trial judge's misconduct outside the courtroom was indeed egregious, Petitioner is not entitled to relief where he cannot prove that such misconduct had any impact, much less a substantial impact, on his trial.

"Structural error" refers to a constitutional error which so deprives a defendant of "basic protections" that the "criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair." *Rose v. Clark*, 478 U.S. 570, 577-78 (1986). Although they occur in a "very limited class of cases," *Neder v. United States*, 527 U.S. 1, 8 (1999), structural errors "defy analysis by 'harmless-error' standards," *Arizona v. Fulminante*, 499 U.S. 279, 306 (1991), and "necessitate automatic reversal." *Neder*, 527 U.S. at 8. In collateral proceedings, Courts look to "whether the [structural] errors alleged . . . could have rendered [the] trial fundamentally unfair." *McBee v. Grant*, 763 F.2d 811, 818 (6th Cir. 1985).

A trial judge's bias, under certain circumstances, may constitute structural error. *Neder*, 527 U.S. at 8. The Supreme Court has held that due process entitles criminal defendants to a "fair trial in a fair tribunal . . . before a judge with no actual bias against the defendant or interest in the outcome of his particular case." *Bracy v. Gramley*, 520 U.S. 899, 904-05 (1997); *see Tanner v. United States*, 483 U.S. 107, 126 (1987) (holding that a fair tribunal must be "both impartial and mentally competent to afford a hearing"). The Supreme Court has set out "an objective standard that, in the usual case, avoids having to determine whether actual bias is present," which instead of proof of subjective bias asks whether "the average judge in his position is likely to be neutral or whether there is an unconstitutional potential for bias." *Williams v. Pennsylvania*, 136 S. Ct.

52

1899, 1905 (2016)(quoting *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 881 (2009))(internal quotations omitted). Such bias "has traditionally been proved by citation to facts external to the judicial proceedings in question, such as a judge's pecuniary or personal interest in the outcome of the proceedings before her." *Mason v. Burton*, 720 F. App'x 241, 245 (6th Cir. 2017) (citing *In re Murchison*, 349 U.S. 133, 142 (1955)). Recusal of a trial judge may be required even when a judge "has no actual bias," but "'the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable.'" *Rippo*, 137 S. Ct. at 907 (quoting *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)); *Coley v. Bagley*, 706 F.3d 741, 752 (6th Cir. 2013) (stating that a petitioner had "to show an unconstitutionally high probability of actual bias" on part of the trial judge to prevail on claim that trial counsel was ineffective by failing to raise an argument that the trial judge should have recused herself). "To violate a defendant's right to a fair trial, 'a trial judge's intervention in the conduct of a criminal trial would have to reach a significant extent and be adverse to the defendant to a substantial degree.'" *McBee*, 763 F.2d at 818 (quoting *Daye v. Att'y Gen. of N.Y.*, 712 F.2d 1566, 1572 (2d Cir. 1983)).

Petitioner raised this claim to the TCCA in his post-conviction appeal. There, the TCCA applied state precedent which mirrors the federal standard set out in *Neder* and provides that when a constitutional, structural error occurs, no criminal punishment could be regarded as fundamentally fair, and automatic reversal is required. *See Cornwell II*, 2017 Tenn. Crim. App. LEXIS 994, at *16 (citing *State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008)). The TCCA likewise cited Supreme Court precedent, *Washington v. Recuenco*, 548 U.S. 212, 218 n.2 (2006), which provides that a biased trial judge is an example of such a constitutional, structural error. The court then cited to a TSC order addressing Judge Baumgartner's conduct in three cases pending at the time of Petitioner's trial, which held that it was "aware of no authority holding that

Case 3:19-cv-00126-DCLC-DCP   Document 23   Filed 04/07/22   Page 53 of 60   PageID #: 4237

a trial judge's misconduct outside the courtroom constitutes structural error when there is no

showing or indication in the record that the trial judge's misconduct affected the trial proceedings."

*Cornwell II*, 2017 Tenn. Crim. App. LEXIS 994, at*48 (citing *State v. Letalvis Cobbins,*

*LeMaricus Davidson, and George Thomas*, No. E2012-00448-SC-R10-DD, 2012 Tenn. LEXIS

965, slip op. *1 (Tenn. May 24, 2012)). Despite Petitioner's contention that this order should not

be controlling, the TCCA reaffirmed its reliance on the TSC's order, holding that it had later

adopted the order in a published opinion which was binding. *Id.* The TCCA then went on to quote

*Bracy v. Gramley* in its analysis that Petitioner had not proven actual bias by Judge Baumgartner:

> The right to a fair trial before an impartial judge is a fundamental constitutional right."
> State v. Benson, 973 S.W.2d 202, 205 (Tenn. 1998) (emphases added). However,
> "most questions concerning a judge's qualifications to hear a case are not constitutional
> ones, because the Due Process Clause of the Fourteenth Amendment establishes a
> constitutional floor, not a uniform standard." Bracy v. Gramley, 520 U.S. 899, 904
> (1997). Rather, these questions are "answered by common law, statute, or the
> professional standards of the bench and bar." Id. The floor established by the Due
> Process Clause simply "requires a 'fair trial in a fair tribunal,' before a judge with no
> actual bias against the defendant or interest in the outcome of his particular case." Id.
> at 904–05 (emphasis added). A trial judge's misconduct amounts to a structural
> constitutional error when the misconduct affects the judge's impartiality. Put another
> way, a trial judge's misconduct constitutes a structural error when that "conduct pierces
> the veil of judicial impartiality." People v. Stevens, 869 N.W.2d 233, 242 (Mich. 2015).
>
> For example, in Benson our supreme court held that "bribery solicitation [by a trial
> judge], if proven, would constitute the denial of [a] petitioner's fundamental
> constitutional right to a fair trial before an impartial judge" and that the likelihood of
> bias was "even stronger" when the trial judge solicited "but did not receive a bribe from
> the petitioner." 973 S.W.2d at 206. While our supreme court broadly stated in Benson
> that "[a] trial is either fair or not" and that "[e]vidence of judicial corruption requires
> reversal regardless of the other facts of the particular case," those generalities are in
> conflict with the case law cited in the opinion and the court's ultimate holding that
> "[t]he denial of [a] petitioner's right to an impartial judge is a constitutional error which
> affects the integrity of the judicial process" with "[a] new trial [being] the only
> remedy." Id. at 207 (emphasis added).
>
> More instructive is the United States Supreme Court's opinion in Bracy, which our
> supreme court relied on for its holding in Benson. In Bracy, the trial judge "was shown
> to be thoroughly steeped in corruption" by accepting bribes from criminal defendants
> to "fix" their cases. 520 U.S. at 901, 909. The petitioner in Bracy was not solicited for
> a bribe but argued that the trial judge's corruption caused him to have a "compensatory,
> camouflaging bias" against the petitioner. Id. at 905. Key to the Supreme Court's

holding was the fact that the petitioner pointed "not only to [the trial judge's] conviction for bribe taking in other cases, but also to additional evidence ... that [lent] support to his claim that [the trial judge] was actually biased <u>in the petitioner's own case</u>." <u>Id.</u> at 909. Furthermore, the Supreme Court's holding was limited in that the petitioner had established "good cause" for discovery in his federal habeas corpus action. <u>Id.</u> The <u>Bracy</u> opinion acknowledged that it was possible the petitioner could have been "unable to obtain evidence sufficient to support a finding of actual judicial bias in the trial of his case." <u>Id.</u>

The Petitioner argues that Judge Baumgartner had "a motivation" to be biased in favor of the State "in order to prevent suspicion or investigation into ... [his] misconduct" and that this "appearance of bias [was] a structural constitutional defect." However, as appalling as Judge Baumgartner's out-of-court misconduct was, the mere appearance of bias is not sufficient to establish a structural constitutional error. As stated in <u>Bracy</u>, the Due Process Clause requires a trial judge with "<u>no actual bias</u> against the defendant." 520 U.S. at 905 (emphasis added). Furthermore, the petitioner in <u>Bracy</u> did not just rely on the trial judge's out-of-court misconduct but presented specific evidence as to how that misconduct affected his particular case. <u>Id.</u> at 909; <u>see also In re Hunt</u>, 658 A.2d 919, 921–23 (Vt. 1995) (holding that there was no structural error when an appellate judge's misconduct in rejecting a plea agreement and change of venue in an interlocutory appeal was "wholly unrelated to [the] petitioner's trial").

Here, the Petitioner did not present evidence of Judge Baumgartner's out-of-court misconduct causing him to be biased specifically against the Petitioner. Lead counsel and co-counsel both testified about a change in Judge Baumgartner's demeanor and their perception that Judge Baumgartner's behavior was directed at the defense bar in general. However, there was nothing in the trial court record or this court's opinion on direct appeal that would demonstrate a specific bias against the Petitioner in this case. Put another way, no evidence showed that Judge Baumgartner's out-of-court misconduct pierced the veil of judicial impartiality in the Petitioner's trial proceedings.

The Petitioner also argues that Judge Baumgartner's presiding over his trial court proceedings constituted a structural constitutional error because Judge Baumgartner was impaired during the proceedings due to his addiction to pain killers. There is a surprising dearth of case law regarding whether the impairment of a trial judge would constitute a structural constitutional error. The cases dealing with a trial judge's misconduct and structural constitutional error focus on the misconduct's effect on the trial judge's impartiality. <u>See, e.g.</u>, <u>Bracy</u>, 520 U.S. at 905–09; <u>Benson</u>, 973 S.W.2d at 205–06. The Petitioner relies on <u>Summerlin v. Stewart</u>, to support his argument that a trial judge's admitted drug use and subsequent criminal conviction alone would constitute a structural constitutional error. 267 F.3d 926, 950–56 (9th Cir. 2001), <u>opinion withdrawn on reh'g en banc</u>, 341 F.3d 1082 (9th Cir. 2003), <u>rev'd and remanded on other grounds, Schriro v. Summerlin</u>, 542 U.S. 348 (2004).

We do not find <u>Summerlin</u> to be persuasive. First, we believe that it is clear from the applicable case law that a trial judge's out-of-court misconduct must directly affect the trial proceedings at issue to constitute a structural constitutional error. Second, the opinion was withdrawn by the United States Ninth Circuit Court of Appeals and ordered not to "be cited as precedent by or to [the Ninth Circuit] or any district court

of the Ninth Circuit." Summerlin v. Stewart, 281 F.3d 836, 837 (9th Cir. 2002). Finally, the cases relied upon in the Summerlin opinion involved the competency of jurors rather than jurists. 267 F.3d at 948–49 (citing Tanner v. United States, 483 U.S. 107 (1987); Jordan v. Massachusetts, 225 U.S. 167 (1912)). Incidents of juror bias and misconduct have generally been found not to constitute structural constitutional error. See United States v. Tejeda, 481 F.3d 44, 50 (1st Cir. 2007) (rejecting a defendant's argument that claims of juror bias should be treated as structural constitutional error like claims of judicial bias); see also 7 Wayne R. LaFave et al., Criminal Procedure § 27.6(d) (4th ed. Supp. 2016).

In his brief, the Petitioner also cites to an order granting post-conviction relief by a different post-conviction court in a separate case involving Judge Baumgartner. See Final J. Order at 35, Raynella Leath v. State, No. 104426 (Tenn. Knox County Crim. Ct. May 12, 2016). However, the trial for the petitioner in Raynella Leath v. State occurred several months after the Petitioner's trial. Id. at 2 (noting that Ms. Leath's trial occurred in January 2010). Furthermore, unlike this case, there was testimony at the Raynella Leath v. State post-conviction hearing from a former courtroom officer that Judge Baumgartner appeared asleep during the trial and that she would slam the courtroom door to awaken him. Id. at 26–28. Accordingly, we do not find the post-conviction court's order in Raynella Leath v. State to be persuasive to our decision in this case because the testimony at the Petitioner's post-conviction hearing was much less compelling than what was presented at the Raynella Leath v. State hearing.

In the end, the question of whether Judge Baumgartner was intoxicated during the Petitioner's trial court proceedings is one of the credibility of the witnesses. The Petitioner testified that he saw Judge Baumgartner asleep on several occasions but told no one. Mr. Davis testified that he saw Judge Baumgartner with his head slumped down, but he was unsure if Judge Baumgartner was asleep. Lead and co-counsel both testified that they saw nothing during the Petitioner's trial that would lead them to believe Judge Baumgartner was asleep or intoxicated. However, both lead and co-counsel were concerned that Judge Baumgartner was confused and not paying attention during the last motion for new trial hearing.

The post-conviction court accredited the testimony of lead and co-counsel over the Petitioner's testimony regarding Judge Baumgartner's appearance during the trial. Conversely, the post-conviction court disagreed with lead and co-counsel's assessment of Judge Baumgartner's performance during the motion for new trial hearings. The post-conviction court found after its review of the trial record that "[o]nce having his memory refreshed, [Judge Baumgartner] demonstrated recall of the previous hearings and a complete understanding of the issues" at the motion for new trial hearings and that the trial record overall showed Judge Baumgartner "to be coherent, engaged, and thoughtful." The post-conviction court concluded that the evidence did not show that Judge Baumgartner was impaired during the trial or in denying the Petitioner's motion for new trial.

Factual issues are to be resolved by the post-conviction court as are questions concerning the credibility of witnesses and the weight and value to be given to their testimony. Fields, 40 S.W.3d at 456. We are constrained in our review of these issues and bound by the post-conviction court's findings of fact unless we conclude that the

56

evidence in the record preponderates against those findings. Id. Following our review of the record and regardless of our abhorrence at Judge Baumgartner's illegal, out-of-court misconduct, we conclude that the evidence in the record does not preponderate against the post-conviction court's factual findings regarding whether Judge Baumgartner was intoxication during the Petitioner's trial proceedings. Accordingly, we affirm the post-conviction court's denial of post-conviction relief with respect to the Petitioner's claim of structural constitutional error.

*Cornwell II*, 2017 Tenn. Crim. App. LEXIS 994, at *16-18.

The TCCA correctly applied *Bracy* and *Neder* and parallel state precedent to Petitioner's claims, thus entitling its holding to deference under the AEDPA. *See Fowler v. Holloway*, No. 1:14-cv-256, 2017 U.S. Dist. LEXIS 156326, at *4-7 (E.D. Tenn. Sept. 25, 2017) (holding that a state court's application of state law paralleling federal structural error precedent would suffice to entitle the state court's holding to AEDPA deference); *see also Williams v. Taylor*, 529 U.S. 362, 406 (2000) (providing that a run-of-the-mill state court decision applying the correct legal rule to the facts of a prisoner's case does not fit comfortably within the "contrary to" clause). The Court cannot find that the TCCA's denial of this claim was either "contrary to" or an "unreasonable application" of federal law.

The TCCA first noted that Petitioner had not presented evidence of former Judge Baumgartner's specific bias against him and went on to find that Judge Baumgartner's out-of-court conduct did not "pierce the veil of judicial impartiality" in Petitioner's trial proceedings. While Petitioner is correct that the Supreme Court clarified in *Rippo* that actual bias is not required for a finding of judicial bias, and an "unconstitutionally high probability of bias" may suffice, a finding of structural error still necessitates a finding that the judge's misconduct impacted *Petitioner's* trial in a significant and adverse way. While the TCCA couched its holding in terms of "actual bias," its analysis appropriately examined whether there was any indication that Judge Baumgartner's misconduct directly affected Petitioner's trial proceedings. The court credited testimony by Petitioner's counsel that although they noted a change in Judge Baumgartner's demeanor over time, neither could point to

anything specific at Petitioner's trial which would demonstrate that Judge Baumgartner was impaired at the time of trial. *Cornwell II*, 2017 Tenn. Crim. App. LEXIS 994, at *55-56. It furthermore credited the post-conviction court's factual finding that the record belied Petitioner's counsels' allegations of "confusion" by Judge Baumgartner, particularly at Petitioner's hearing on his motion for new trial. *Id.* The TCCA specifically noted that the post-conviction court found that the trial record showed him to be "coherent, engaged, and thoughtful." *Id.*

While Judge Baumgartner's out-of-court misconduct certainly shocks the conscience, the Court agrees with the TCCA's assessment that his misconduct did not have a substantial, adverse impact on Petitioner's trial. The investigation into Judge Baumgartner's misconduct did not begin until September 2010, but Petitioner's trial occurred in May 2009. Although the TBI's investigative records indicate that Judge Baumgartner was using multiple prescriptive opiates in 2008, this Court previously noted that this same record found that the "records fall short of showing impairment of the judge during late 2008 and early 2009 proceedings." *Fowler*, 2017 U.S. Dist. LEXIS, at *20. Although Petitioner contends Judge Baumgartner was potentially biased against the defense to avoid the ire of the district attorney's office, Petitioner has done no more than speculate, and certainly has not offered clear and convincing evidence to prove this point. Having reviewed the record, the Court does not find Judge Baumgartner blindly deferred to the State throughout Petitioner's trial or knew of the potential of the State investigating him. Moreover, while lead counsel indicated that much of Judge Baumgartner's negative behavior was directed at members of the defense bar, co-counsel indicated that the judge's irritation was also directed at his own court officers, and even witnesses. Because Petitioner cannot show that Judge Baumgartner was biased or impaired in a way which impacted Petitioner's trial, he is not entitled to relief on this claim.

### D. Tennessee Supreme Court Rule 13 §5 is contrary to Due Process.

Petitioner argues that he was denied due process and equal protection because Tennessee

Supreme Court Rule 13, §5 prevented his counsel from obtaining expert services until the case had reached criminal court [Doc. 1, p. 36-40]. Petitioner points to a time frame from March 2008, when the victim was killed, to May 2008 when his counsel was unable to hire an expert, and during which time he alleges the evidence on his vehicle degraded due to the State's neglect and argues that this rule amounts to discrimination against indigent defendants who are unable to afford to hire an expert on their own. [*Id.*]. Respondent claims that this issue is procedurally defaulted as Petitioner failed to raise it to the state court, and that as Petitioner has not argued cause and prejudice exist to excuse the default, the Court should dismiss this claim.

The Court agrees that this claim, while technically exhausted, is procedurally defaulted as a result of Petitioner's failure to raise this claim to the state courts. *See Atkins v. Holloway*, 792 F.3d 654, 657 (6th Cir. 2015) ("[W]hen a petitioner fails to present a claim in state court, but that remedy is no longer available to him, the claim is technically exhausted, yet procedurally defaulted."). To demonstrate that his claim is entitled to review, Petitioner would have to demonstrate cause, some factor external to the defense which prevented him from raising the issue in his first appeal, and prejudice, that these inadequacies worked to his actual and substantial disadvantage. Petitioner has neither addressed the default of this claim nor argued cause and prejudice in either his original petition or his reply brief. This claim can not be characterized as later-arising, and Petitioner has presented no argument, nor is the Court aware of any, that some rule or other circumstance prevented him from raising this claim in state court. Accordingly, this claim is procedurally defaulted and not entitled to review.

## IV.    CONCLUSION

For the reasons set forth above, Petitioner's petition for a writ of habeas corpus [Doc. 1] will be **DENIED,** and this action will be **DISMISSED**.

59

## V.    CERTIFICATE OF APPEALABILITY

The Court must now consider whether to issue a certificate of appealability ("COA"), should Petitioner file a notice of appeal.  Under 28 U.S.C. § 2253(a) and (c), a petitioner may appeal a final order in a habeas proceeding only if he is issued a COA, and a COA may only be issued where a Petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2).  When a district court denies a habeas petition on a procedural basis without reaching the underlying claim, a COA should only issue if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Where the court dismissed a claim on the merits, but reasonable jurists could conclude the issues raised are adequate to deserve further review, the petitioner has made a substantial showing of the denial of a constitutional right.  *See Miller-El v. Cockrell*, 537 U.S. 322, 327, 336 (2003); *Slack*, 529 U.S. at 484.  Reasonable jurists would not disagree that Petitioner did not suffer a structural error related to trial judge bias, was not deprived of due process related to the destruction of the evidence in his trial, did not receive ineffective assistance of counsel, or that his claim regarding Tennessee Supreme Court Rule 13 is procedurally defaulted.  Accordingly, a **COA SHALL NOT ISSUE.**

**AN APPROPRIATE ORDER WILL ENTER.**

**ENTER:**

s/Clifton L. Corker
United States District Judge